ILLINOIS STATE TOLL HIGHWAY AUTHORITY, Plaintiff-Appellee and Cross-Appellant, v. HERITAGE STANDARD BANK AND TRUST COMPANY, as Trustee, *et al.*, Defendants-Appellants and Cross-Appellees.

Second District   No. 2—92—0756

Opinion filed August 30, 1993.

S. Louis Rathje, of Rathje, Woodward, Dyer & Burt, of Wheaton, and Sandra L. Hebenstreit, of Righeimer, Martin & Cinquino, P.C., of Chicago (Leo N. Cinquino, of counsel), for appellants.

Helm & Day, of Oswego (Stephen D. Helm, of counsel), David W. Krula, of Law Offices of Helm & Day, of Naperville, and Frank M. Howard, Special Assistant Attorney General, of Oak Brook, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

This action arises from an eminent domain proceeding. The plaintiff, the Illinois State Toll Highway Authority, acquired property owned by the defendants, Heritage Standard Bank, Gallagher and Henry, Inc., the Orchard Building Co. and the Farmingdale Utility Co., through a quick-take proceeding. The amount of preliminary compensation exceeded the amount of final compensation awarded to the defendants. The defendants now appeal from the jury verdict. On appeal, the defendants assert that (1) numerous evidentiary errors occurred at trial which prejudiced the defendants and, on this basis, the jury verdict should be reversed and a new trial ordered, and (2) the defendants should not be required to pay interest on any excess preliminary compensation until the final adjudication of just compensation has occurred by issuance of this court's mandate. On cross-appeal, the plaintiff contends that the trial court erred in finding that the plaintiff was entitled to interest on the excess compensation only during the period subsequent to the entry of judgment on the excess.

On August 18, 1987, the plaintiff filed an eminent domain action by which it sought to acquire a parcel of land owned by the defendants in Woodridge. The plaintiff sought acquisition by quick-take. (Ill. Rev. Stat. 1987, ch. 110, par. 7—103.) A quick-take proceeding is commenced after the filing of a complaint to condemn by filing a motion for immediate vesting of title pursuant to section 7—103 of the Eminent Domain Act (Act) (Ill. Rev. Stat. 1987, ch. 110, par. 7—103). This is followed by a hearing on the motion for immediate vesting of title which is divided into three parts. First, the plaintiff offers evidence on the right to take the property. Next, it must be proven that it is necessary to acquire the property by quick-take. Third, evidence is presented on the issue of preliminary just compensation. (Giamanco, *Quick-take*, in Illinois Eminent Domain Practice, ch. 4, §4.6 (Ill. Inst. for Cont. Legal Educ. 1989).) Evidence as to the preliminary just compensation may be given by a witness who has appraised the property and who testifies as to the fair-cash-market value of the property taken. In a partial taking, the witness also testifies as to the value of the damage to the remainder. Such testimony is often given by an employee of the plaintiff, but in some situations the appraiser comes from the community. At the conclusion of the hearing the court enters an order fixing preliminary just compensation pursuant to section 7—104(c) of the Act (Ill. Rev. Stat. 1987, ch. 110, par. 7—104(c)). Giamanco, *Quick-take*, in Illinois Eminent Domain Practice, ch. 4, §4.6 (Ill. Inst. for Cont. Legal Educ. 1989).

After the determination of preliminary just compensation, the plaintiff deposits the amount of preliminary just compensation with the county treasurer. Subsequently, the court enters an order vesting title of the property in the plaintiff. (Ill. Rev. Stat. 1987, ch. 110, par. 7—105(a).) After the plaintiff has taken possession of the property, the landowner may apply to the court for an order to withdraw the preliminary just compensation. (Ill. Rev. Stat. 1987, ch. 110, par. 7—106.) Every order of withdrawal is conditioned upon the refund of any amount of preliminary just compensation that exceeds the amount finally determined to be just compensation. (Ill. Rev. Stat. 1987, ch. 110, par. 7—106.) However, no interest is paid on the excess payment while the preliminary just compensation is in possession of the landowner until a judgment is entered for repayment to the plaintiff. Ill. Rev. Stat. 1987, ch. 110, par. 7—109; *Department of Transportation v. New Century Engineering & Development Corp.* (1983), 97 Ill. 2d 343.

On August 26, 1987, an order was entered by the trial court awarding preliminary compensation in the amount of $2,486,500. On that same date, an order was entered vesting title after quick-take and allowing the defendants to withdraw the funds deposited as the preliminary compensation. The defendants withdrew the funds deposited as preliminary compensation.

### SUBJECT PROPERTY

The defendants' property (subject property) as of August 18, 1987, was a 132-acre unimproved parcel located at the southeast corner of 83rd Street and Janes Avenue in the Village of Woodridge in Du Page County. The tollway acquisition totaled approximately 30.5 acres that bisected the 132-acre parcel in a north-south direction, leaving the property owner with 50-plus-acre parcels (remainders) on the east and west sides of the tollroad. Prior to the tollroad construction, plaintiff granted easements under the tollroad for sewer and water utilities to connect the east and west remainders. The 30.5-acre acquisition was for construction of north and south lanes of the tollroad, the Boughton Road toll plaza and tollbooths, and for drainage and detention ponds.

The subject parcel had been annexed into the Village of Woodridge in May 1986, pursuant to an annexation agreement that zoned the property with a residential classification.

The official Village of Woodridge comprehensive land use plan and map was adopted by the Village in October 1985. It was in effect as of August 17, 1987, and projected office and research land uses for

both the east and the west remainders of the subject property. The text of the plan made it clear that the land uses approved in the official plan were predicated upon the building of the tollroad through this area, with projected interchanges at 75th Street and Boughton Road.

Plaintiff and defendants agreed that the subject property is subject to floodplain, wetland, and unsuitable soil restraints that impact the usability of the property. The plaintiff's and defendants' witnesses presented conflicting evidence as to how much of the property was floodplain, how much had unsuitable soils, and to what depth those soils existed.

## TRIAL

A jury trial was conducted between December 9, 1991, and December 19, 1991. The issue at trial was the value of the subject property on August 18, 1987, and the amount of damages, if any, to the remaining two tracts of land on either side of the take.

Prior to trial, the parties presented motions *in limine*. At issue in this case are two of defendants' motions *in limine*. The first sought to bar the sale commonly referred to as the Citicorp sale. The motion was denied. The second sought to bar reference to Gallagher and Henry owning any other land in the area of the subject property. This motion was also denied. Since they cross-petitioned for damages, the defendants elected to present their case first. *Department of Business & Economic Development v. Brummel* (1972), 52 Ill. 2d 538, 543.

During the trial and before the presentation of plaintiff's case, an *in camera* hearing was conducted to determine if there was a reasonable probability of rezoning to permit office or research-type use on the remainder after the taking. Counsel for each party told the court what the respective parties believed the testimony would show if the witnesses were called to testify. The court concluded that the plaintiff had sustained its burden to show a reasonable probability of rezoning, and ruled that such evidence was admissible.

At trial, the defendants presented the testimony of eight witnesses. Three of those witnesses testified as to highest and best use of the subject property. Two of the witnesses estimated its valuation based on comparable sales in the area. Defendants' experts testified that the estimated value of the parcel ranged from $63,600 to $65,000 per acre. The defendants argued that the highest and best use after the take was multiple-family residential. The experts opined that the property would be damaged because it was cut in half, there would be additional costs to extend utilities, lost frontage on 83rd Street, and

increased noise problems. The defendants' experts estimated the damage to the remainder to range from $1 million to $2 million. The defendants argued that there was no reasonable probability of rezoning to permit the plaintiff's claimed highest and best use. The defendants subpoenaed the appraiser whose opinion was used by the parties to serve as a basis for the preliminary value at quick-take. His opinion of the highest and best use was commercial and multiple-family development. His opinion of value was $65,000 per acre, with $808,500 in damages to the remainder.

The plaintiff presented 13 witnesses who testified as to the value of the subject property and any damages to the remainder. In addition, plaintiff called landowner Robert Gallagher as an adverse witness. The plaintiff disputed the defendants' theory of highest and best use, arguing that the highest and best use after the take was office because the tollway exposure made the remainders attractive to office and research development. Furthermore, the plaintiff argued, other land in the area was already going to commercial and prospective commercial development. The plaintiff presented evidence of a probability of rezoning to office on the basis that while there was no market for multiple-family development in the area, there was a market for office and commercial development. The plaintiff's witnesses testified as to comparable sales in the area, and three of those witnesses estimated the value of the subject property to range from $15,000 to $21,500 per acre. Those witnesses each used several different comparable sales on which to base their opinions. One of those witnesses stated that the Citicorp property was particularly comparable to the subject, and another testified that he placed the greatest weight on the Citicorp comparable sale. The plaintiff's counsel argued that Citicorp was the most comparable sale. Evidence was presented that the Citicorp property was located 600 feet south of the subject property and was nearly the same in size, amount of wetland present, and type of soil. It sold for $15,700 per acre in 1988.

The jury returned a verdict in favor of the plaintiff, finding the final just compensation for taking of the subject property to be $650,750 and finding that there were no damages to the remainder. Judgment on the jury's verdict was entered by the trial court on December 20, 1991. The court entered an order on January 17, 1992, wherein the court provided that the defendants had until April 16, 1992, to refund the excess compensation. The court continued the cause to April 20, 1992, to ascertain compliance with the order. On April 20, 1992, the trial court ascertained that the defendants had failed to refund the excess compensation within the reasonable period

fixed by it and entered judgment in favor of the plaintiff on the excess compensation. On May 15, 1992, the trial court entered *nunc pro tunc* April 20, 1992, a judgment under section 7—109 of the Code of Civil Procedure and vacated the order entered April 20, 1992. It entered judgment on the excess compensation, finding that interest on the excess at 9% per annum was $447.72 *per diem*. On May 18, 1992, plaintiff filed a post-trial motion challenging that portion of the court's order entered May 15, 1992, which denied plaintiff's request for interest on the excess compensation from the date of withdrawal by the defendants to the date of payment refund. On June 1, 1992, the trial court entered an order denying the post-trial motions of both defendants and plaintiff. Defendants filed their notice of appeal on June 30, 1992, and plaintiff filed its notice of cross-appeal on July 9, 1992.

In Illinois, under the law of eminent domain, the owner of property condemned for public use is entitled to just compensation measured by the fair-market value of the property at its highest and best use. (*Department of Public Works & Buildings v. An Association of Franciscan Fathers* (1977), 69 Ill. 2d 308, 314; *Lake County Forest Preserve District v. Petersen* (1981), 93 Ill. App. 3d 731, 733.) Quicktake is "a proceeding within a proceeding." (*Department of Public Works & Buildings v. Dust* (1960), 19 Ill. 2d 217, 218; *Department of Transportation v. Roodhouse* (1982), 104 Ill. App. 3d 880, 883.) After filing a petition for condemnation, the condemnor may move for a quick-take to gain early title to and use of the property. After the court has determined that the condemnor has the authority to expropriate the property, it must decide upon a preliminary amount of compensation. *Roodhouse*, 104 Ill. App. 3d at 883.

At issue in this appeal are several evidentiary rulings by the trial court. On review, a trial court's ruling on evidentiary issues is subject to the abuse of discretion standard (*Oak Brook Park District v. Oak Brook Development Co.* (1988), 170 Ill. App. 3d 221, 234), and, in case of trial court error, a reversal is called for only if the evidence improperly admitted was sufficiently prejudicial to change the outcome of the trial. *Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 511.

In the first issue on appeal, the defendants assert that the trial court committed reversible error by denying defendants' motion *in limine* No. 1 and defendants' motion for rehearing on said motion. The motion *in limine* No. 1 sought to bar the evidence of the Citicorp sale because the sale occurred after the complaint to condemn was filed. The defendants assert that this was an improper admission of a post-condemnation sale, as it was one which was affected by the

tollroad. The plaintiff asserts that the trial court properly admitted evidence of the Citicorp sale as it was the most comparable sale offered by either party and there was no statutory, judicial or logical basis to exclude it.

If post-condemnation sales are to be considered as comparable sales, the party offering the sale as evidence is required to show that such sale was unaffected by the condemnation proceeding or the result thereof. (*City of Chicago v. Blanton* (1958), 15 Ill. 2d 198, 203-04; *Department of Business & Economic Development v. Pioneer Trust & Savings Bank* (1976), 39 Ill. App. 3d 8, 12; *Trustees of Schools of Township No. 37 North Range No. 13 East v. Chicago City Bank & Trust Co.* (1970), 126 Ill. App. 2d 302, 306.) The rule can be illustrated by considering a hypothetical utilizing the condemned (subject) property, A, and the post-condemnation sale property, B. The general rule is, if, on the disclosure of the condemnation of A, B's sale price is affected, then evidence of B's sale is not admissible as a comparable sale in a valuation proceeding to set a value on A.

■ In interpreting *Blanton, Pioneer*, and *Chicago City Bank*, we note the rationale for the rule. Those three cases involved factual situations in which the offeror of the evidence of the post-condemnation sale of B was the landowner who was in a position to benefit by the change in value of B. That is, in those cases, since the condemnation increased the value of B, evidence of the value of B was introduced to the valuation proceeding to increase the value of A. The landowner was in a position to benefit by the increased value of A. In those cases, evidence of the post-condemnation sale was excluded to prevent prejudice to the other party. We infer from those cases that where evidence of a post-condemnation sale is offered by a party which will benefit from the effect of the condemnation, such evidence is properly excluded. Conversely, if evidence of a post-condemnation sale is offered by a party that is not in a position to benefit from the effect of the condemnation, then such evidence is admissible as it is not prejudicial to the other party.

We now examine the evidence regarding the issue of whether the Citicorp sale was affected by the potential presence of the tollway. Chester Parrish, the president of the company which bought the Citicorp property, made the following statements upon questioning in a deposition:

"BY MR. NERO [Plaintiff's attorney]:

Q. Mr. Parrish, you stated that your knowledge of the construction of the North/South Tollway did have an impact on the

price that you paid for this [Citicorp] property, and that in fact I think you said it was the deciding factor.

Can you explain in a little bit more detail what impact it had on the price that you paid? In other words, was it a negative or a positive impact?

Did it cause you to pay more or less if your [sic] able to say?

A. Well without the tollway, I wouldn't have purchased the property.

Q. And why is that?

A. Because of the impact it would have in the area here.

Q. What impact would you foresee that the tollway would have?

A. A positive impact.

Q. So would it be fair to say or accurate to state that the— your knowledge of the proposed construction of the North/South Tollway did not have a negative impact on the purchase price you paid for this property.

A. Yes."

Two other witnesses testified whether they believed that Parrish was motivated to buy the Citicorp property on the basis of the tollroad nearby.

■ While it appears from this evidence that Parrish was motivated to go through with the sale on the basis of the potential presence of the tollway, scant evidence was presented whether the purchase price was affected by the tollway. This is consistent with the conclusion that the sale was not shown to be affected by the tollway. In order to show an effect by the condemnation, it must be shown that the purchase price was affected. (*Blanton*, 15 Ill. 2d at 203.) In *Blanton*, at issue was the trial court's exclusion of evidence of a post-condemnation sale in the neighborhood of the subject property which was condemned to acquire land for a school. The neighborhood was a residential area, and a nearby school was needed by the residents of that neighborhood. The supreme court concluded that the condemnation action would materially affect the price of neighborhood real estate by presenting a new valuation influence which had not previously existed there. (*Blanton*, 15 Ill. 2d at 203.) The supreme court agreed with the ruling by the trial court in excluding the evidence and affirmed. We interpret *Blanton* to mean that to be "affected" by a condemnation, a post-condemnation sale must be made at a value other than what it would have been made at, but for the condemnation. In this light, Parrish's "motivation" to purchase because of the tollway is irrelevant. However, the evidence showing no negative impact on

the price of the Citicorp property is relevant. The evidence here is the "positive impact" of the condemnation on the value of the property offered as evidence, the Citicorp sale. Such a positive impact in the present case would render a benefit to the landowner, not the condemnor which was the party who offered the evidence. According to our rationale discussed above based on *Blanton, Pioneer,* and *Chicago City Bank,* since the landowner would not suffer prejudice at the introduction of this evidence, it is admissible. Thus, we determine that the plaintiff sustained its burden to show that the value of the postcondemnation sale was not "affected" by the tollroad.

On the basis of this rationale, we determine that the trial court's finding that the sale of the Citicorp property was not affected by the tollway was not against the manifest weight of the evidence. Therefore, the trial court was correct in admitting the evidence of the Citicorp sale, as it was a post-condemnation sale which was "unaffected" by the tollway.

In the next issue on appeal, the defendants contend that the trial court committed reversible error by allowing the plaintiff's witness, Barofsky, to testify as to the content of the minutes of the Woodridge zoning board hearing involving annexation and zoning of the subject property in 1986. The defendants assert that admission of this testimony was highly prejudicial since it suggested some impropriety on the part of the defendants during the adoption of the zoning ordinance on the subject property. The plaintiff asserts that the admission of Barofsky's testimony regarding the minutes was the type of evidence reasonably relied upon by real estate experts. Furthermore, plaintiff argues, it was necessary to clarify an ambiguity in the annexation agreement.

The testimony at issue was as follows:

"BY MR. HELM [plaintiff's attorney]:

Q. Mr. Barofsky, you reviewed—you reviewed the various statements that were made at the public hearing, both by the village officials and by the attorney for the property owner who made the presentation and by the people who were there making comments, did you not, sir?

A. [Mr. Barofsky] Yes, sir, I did.

Q. And those—those statements that were made are a part of the official record of the Village of Woodridge when this property was annexed and zoned, are they not, sir?

A. Yes, sir, they are.

Q. In reviewing those particular statements that were made by the various officials, was it or was it not made clear that in

annexing and zoning this property to multiple family, that the property owner was representing to the village that it was uncertain whether the tollway was going to come through, and they were requesting that the property be rezoned with total disregard to the tollway?

MR. CINQUINO [Defendants' attorney]: I object to that.

THE COURT: Right. Objection overruled. You may answer.

THE WITNESS: Yes, sir.

My opinion in reading Mr. Rathje's statement at the time—

BY MR. HELM:

Q. Mr. Rathje?

A. A well known Du Page County attorney who represented the Gallagher entity on the entire annexation and rezoning.

Q. Go ahead.

A. And Mr. Rathje specifically stated when asked from a member of either the plan commission or the attendance at large, has—is your plan—has your plan taken into consideration the new tollway?

I think he called it FAP 431 or something, and Mr. Rathje indicated no.

This plan is basically moving ahead and his feelings were and specifically stated in the document, that we have had contact with these people.

We contacted them five years ago. We have heard nothing from the tollway commission of the state, and we have to get on with business.

That was my interpretation of his statement, and I think if that document were presented here and people were allowed to read it, that's what they would read.

MR. CINQUINO: I move that answer be stricken.

THE COURT: I'll strike the last portion of it, that the document you could read it and that's what you would read.

The rest of it may stand."

As an expert valuation witness, Barofsky was to make two separate analyses with respect to the issue of highest and best use. First, he had to evaluate the highest and best use of the land without consideration of the taking or the tollway improvements, which constituted the "before analysis." Then, he had to evaluate the highest and best use of the remainder, taking into account the impact of the tollway improvement on the remainder, which constituted the "after analysis." (*Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.* (1990), 196 Ill. App. 3d 5.) If either of those

uses required a change in zoning, he also had to determine whether there was a reasonable probability of obtaining the necessary zoning in the relatively near future. (*Department of Transportation v. Western National Bank* (1976), 63 Ill. 2d 179, 185.) In Barofsky's opinion, the highest and best use of the western 50-acre remainder, in the after analysis, was for office research uses. Such a use would require a change in zoning. His opinion was that there was a reasonable probability that Woodridge would grant the necessary rezoning.

Among the factors that Barofsky considered in arriving at his opinion were the 1985 Woodridge comprehensive plan and land-use map, the 1985 Du Page County land-use plan, and the 1986 annexation agreement and zoning ordinance related to the subject property. The land-use plans and the subsequently approved annexation agreement and zoning ordinance appeared to conflict with each other. The land-use plans and comprehensive plan projected office or research uses, but the 1986 zoning ordinance stated that the land was for multiple-family residential development. Complicating matters even further was a statement in the "findings" section of the annexation agreement which said that the developer's preliminary plan for multiple-family residential conformed to the intent and spirit of the planning objectives of the 1985 Woodridge comprehensive plan.

In considering these documents with respect to the highest and best use of the land before and after the taking, the question could be raised whether Woodridge had changed its position regarding projected uses for the subject property from the time it drew up the comprehensive plan in 1985 to the time it annexed and zoned the subject property in 1986. Thus the question confronting Barofsky was whether the residential zoning granted in 1986 reflected Woodridge's long-term objectives for the subject property as impacted by the tollway or was it limited to uses appropriate in the absence of the tollway. The zoning ordinance and annexation agreement were silent on the question whether Woodridge considered the impacts of the tollway in granting the requested residential zoning. Obviously, an understanding of Woodridge's goals and projected uses for this property after tollway construction was critical to the after analysis.

In light of the apparent conflict between the comprehensive plan and the zoning ordinance, and the failure of the zoning ordinance and annexation agreement to clarify the question, Barofsky went a step further in his research and examined the official public records of the subject property annexation and zoning. Upon reviewing the minutes of the sworn testimony from the public hearing, Barofsky found that they clarified the question of whether the Woodridge zoning

board had considered the tollway impact in granting the zoning. As illustrated in the colloquy excerpted above, Barofsky found that the attorney representing the owner of the subject property had stated at the public hearing that the owner had attempted to contact the tollway authorities but never received a response, that they were uncertain whether the tollway was going to come through, and that they were requesting the property be rezoned with total disregard to the tollway.

Based upon these statements, Barofsky concluded that the residential use was granted without consideration of the tollway. On that basis, he concluded that the 1986 zoning ordinance did not reflect a change of position by the Village of Woodridge regarding the projected land use assuming a tollway improvement.

Thus, there was a clear rationale why the plaintiff insisted that it needed to introduce the contents of the minutes through Barofsky's testimony. Furthermore, we note that, during the trial, just prior to the colloquy excerpted above, the trial court gave the jury limiting instructions regarding its use of the testimony about the minutes. The court stated that Barofsky was permitted to tell the contents of the minutes he read. That is, he was permitted to describe the discussion at the time the subject property was annexed in 1986 at the zoning board meeting. However, the court cautioned, Barofsky could not express an opinion on what impacted the mental processes of the members of the zoning board at the time of annexation.

In assessing the propriety of Barofsky's reference to the minutes, the trial court exercised its discretion in deciding that this is the type of evidence reasonably relied upon by an expert witness. (*City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 185-86.) As discussed above, it was not only reasonable but necessary for Barofsky to consider the minutes in order to come to an informed opinion as to the highest and best uses of the land before and after the taking, as well as the reasonable probability of rezoning. The trial court was correct in allowing the testimony for the limited purpose of explaining Barofsky's opinions of highest and best use and reasonable probability of rezoning. *Anthony*, 136 Ill. 2d at 191-92.

The defendants rely on *Oak Brook Development Co.* (170 Ill. App. 3d 221) to stand for the proposition that a court should deny the admission of the minutes of a zoning board hearing or an expert's interpretation of those minutes in an eminent domain case. Like this case, that case involved the issues of the reasonable probability of rezoning and the implication of recent rezoning changes in the area of the subject property. That court found that due to the "clear and unambigu-

ous language of the ordinance as well as the fact that the ordinance specifically states the board of trustees' findings as well as its motives," the minutes and testimony as to the contents of the minutes were properly excluded. (*Oak Brook Development Co.*, 170 Ill. App. 3d at 230.) In the present case, however, the 1986 zoning ordinance did not reveal whether the zoning board considered the planning of the tollway when it passed the 1986 ordinance, nor did it reveal the board's motives. Thus, the zoning documents were unclear on their face as to this issue, and the evidence of the contents of the minutes was properly admitted.

The defendants argue that the testimony was highly prejudicial since it suggested an impropriety on the part of the defendants as to the existing zoning on the subject property. They argue that such testimony implied that the defendants had less than ethical motives for requesting the zoning and annexation. In addition, it raises the issue of the owners' prior knowledge of the possible condemnation. Defendants cite *Department of Transportation v. Newmark* (1975), 34 Ill. App. 3d 811, as a case in which the court decided that it was improper for the plaintiff to present evidence that the defendant had prior knowledge of the condemnation. However, in that case, there was a substantial amount of testimony as well as opening and closing arguments that went to that issue. During closing argument, the plaintiff's attorney characterized the defendant as a man who intended to profit as a result of the condemnation proceeding. (*Newmark*, 34 Ill. App. 3d at 813.) In contrast, in the present case, the plaintiff did nothing to impugn the defendants' motives in zoning the property. According to the record, Barofsky simply testified that the owners' attorney asked that the Village of Woodridge rezone the annexed property without consideration of the tollway. It is not apparent from the record that Barofsky implied that the owner sought multiple-family zoning, in 1986, just to increase the award from the tollway when a condemnation did take place. Thus, the defendants' analogy to *Newmark* is not applicable. For these reasons, we determine that the trial court's admission of Barofsky's testimony regarding the content of the minutes was not an abuse of discretion, and thus affirm that ruling.

Defendants' next contention on appeal is that the trial court erred in allowing the plaintiff to present to the jury evidence on the issue of a reasonable probability of rezoning. Evidence of a reasonable probability is allowed to enable the jury to consider the capabilities of the property. (*Forest Preserve District v. Brookwood Land Venture* (1990), 199 Ill. App. 3d 973, 977; *Lake County Forest Preserve Dis-*

*trict v. Frecska* (1980), 85 Ill. App. 3d 610, 618.) The trial court must make a preliminary determination as a matter of law, by way of an *in camera* hearing, that there is sufficient evidence to permit testimony of values based on such a probability. (*Oak Brook Development Co.*, 170 Ill. App. 3d at 230-31.) The party wishing to present such evidence bears the burden of establishing the existence of a reasonable probability of rezoning. *Brookwood Land Venture*, 199 Ill. App. 3d at 977.

In the present case, the trial court held an *in camera* hearing to determine whether the plaintiff had sufficient evidence to allow its expert to testify to an opinion as to the reasonable probability of rezoning. The trial court ruled in favor of the plaintiff, finding that the plaintiff had made a sufficient showing to admit evidence of a reasonable probability of rezoning before the jury for its consideration on the issue of the value of the subject property.

■ According to the record, at the hearing, the plaintiff's counsel represented that the evidence would show the character of the neighborhood, rezoning of nearby property, change in use patterns, a demand for certain uses, and growth pattern. All of these factors are relevant to the issue of a reasonable probability of rezoning, as are comparable sales, the characteristics of the subject property, and the age of the current zoning ordinances. (*Oak Brook Development Co.*, 170 Ill. App. 3d at 231; *Lombard Park District v. Chicago Title & Trust Co.* (1968), 103 Ill. App. 2d 1.) At the hearing, the defense counsel objected to the admission of evidence that there was a reasonable probability of rezoning by raising the issues that the age of the current zoning ordinance did not support rezoning, the character of the neighborhood did not support rezoning to office, the annexation agreement limits the right to petition for rezoning to the owners and the owners had no intention to do so, and defense counsel contested the demand for office zoning at that location.

■ We determine that the plaintiff sustained its burden by demonstrating a reasonable probability of rezoning as supported by the *Lombard* factors that it presented at the *in camera* hearing and as evidence at trial. Although the defendants represented that conflicting evidence would be presented and that thus the evidence of reasonable probability of rezoning should not go to the jury, we do not agree. The existence of conflicting evidence does not constitute grounds for reversible error. Conflicting opinions were properly resolved by the jury. (*Board of Junior College District No. 515 v. Wagner* (1971), 3 Ill. App. 3d 1006, 1010-11.) Thus, the trial court did not

err in permitting the issue of a reasonable probability of rezoning to go to the jury.

The defendants next contend that plaintiff's witness', Barofsky's, opinions based on residential use should have been stricken, as he was not an expert in the area of residential property valuation and has never done a formal appraisal of residential land. The defendants have no objection to Barofsky's opinion of value post-condemnation at a highest and best use of office or research as the defendants concede that Barofsky is qualified to testify to that opinion. The plaintiff contends that the trial court correctly allowed Barofsky to testify to value based on a residential highest and best use since Barofsky was an experienced real estate consultant. Plaintiff adds that Barofsky properly based his opinion on his knowledge of the parcel, the area, the zoning, and residential comparable sales.

The trial court has broad discretion in determining whether a witness is qualified to testify as an expert. An expert's opinion may be based upon practical experience as well as academic or scientific training. (*Heritage Standard Bank*, 196 Ill. App. 3d at 17.) Expert testimony is admissible if it aids the jury to understand the evidence or determine a fact in issue. *Leonard v. Pitstick Dairy Lake & Park, Inc.* (1984), 124 Ill. App. 3d 580, 587-88.

■ The record revealed that Barofsky had extensive experience and knowledge in the area of real estate valuation and development. He was a real estate developer and development consultant. Barofsky had been involved in the evaluation, selection and development of large acreage properties in Du Page County since 1976. These properties included residential developments and experience in the Woodridge area on multiuse properties such as the Woodridge Golf Course property. Furthermore, in arriving at his opinion, Barofsky acquainted himself with the physical aspects of the subject property, the possible uses, zoning and characteristics of the surrounding area. He also analyzed three residential comparable sales. On the other hand, he was not an appraiser; he did not belong to appraisal organizations.

The defendants cite *Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, and *City of Chicago v. George F. Harding Collection* (1965), 70 Ill. App. 2d 254, as cases in which the court did not permit a person not qualified as an expert in a given area to testify as an expert in that area. *Broussard* was a products liability action brought by a minor who was injured in a gasoline fire in the family garage. The complaint alleged that the gasoline can involved in the fire was unreasonably dangerous in a way which proximately caused the minor's injuries. The plaintiff introduced the testimony of

an expert witness who was a civil engineer to state that the gasoline can was unreasonably dangerous for several reasons. The expert was knowledgeable about the transport of hazardous substances in highway or railway cars, yet had no special knowledge of hazardous substances in gasoline cans. The appellate court determined that the trial court abused its discretion by permitting the expert to testify as to the dangerous nature of the gasoline can. *Broussard*, 108 Ill. App. 3d at 362-63.

*George F. Harding Collection* was an eminent domain case which involved the condemnation of a building used for museum purposes. One issue in the case was the expert testimony of several of the city's witnesses. While the city's witnesses were qualified to testify as to real estate values in the area, none had appraised a museum before. The appellate court determined that the trial court had abused its discretion in permitting the city's witnesses to give opinions necessarily based on a knowledge of museums, when it was evident none had that type of expertise. *George F. Harding Collection*, 70 Ill. App. 2d at 272.

The present case can be distinguished from those two cases on the basis that in each of those cases a very specialized knowledge was needed in order to present an opinion on that particular subject area. For instance, the appraisal of museums is a narrow field, one which may not be properly addressed by general real estate appraisal expertise. In contrast, in the present case, at issue is the ability of an experienced developer to apply his substantial experience in the commercial real estate development field to the field of residential real estate. In order to make a residential valuation, the principles Barofsky had to rely on were not so very different from those he used routinely in the commercial real estate development field. That is, the expertise needed to perform residential valuation is not so vastly specialized as the expertises called for in *Broussard* and *George F. Harding Collection*.

Although Barofsky admitted he was not a residential developer, we determine from the record that he had enough experience in handling residential property for the trial court to have properly admitted his testimony. Thus, the trial court did not abuse its discretion by permitting the jury to hear Barofsky's testimony as to the residential valuation.

Defendants next contend that the trial court committed reversible error by allowing the jury to hear Barofsky's testimony regarding the fact that Homart had made an offer on an option to purchase land to the south of the subject property for a shopping center. Defendants

argue that such evidence before the jury is prejudicial and that courts of this State have held that offers to purchase are not admissible unless the offer is *bona fide* and for cash. The plaintiff points out that the testimony regarding the Homart option was offered to rebut the testimony of several defense witnesses who stated they had considered demand in the area in arriving at a residential highest and best use.

We note that the record reveals that in presenting their case first, the defendants elicited testimony from three of their witnesses which indicated that the witnesses considered the issue of demand in the area as a factor in their determinations of the highest and best use of the subject property. Two of those witnesses determined that the highest and best use of the property after the take was residential. Then, during the plaintiff's case, Barofsky testified as to what factors he considered in arriving at his opinion of highest and best use. Barofsky testified that Homart had expressed an interest in the property immediately south of the subject property. Specifically, he testified:

> "Homart—for those who don't know—is essentially the development branch of Sears.
>
> They normally go in and develop the shopping centers for Sears or at least assist them in the development.
>
> And a contract, I believe, was moved towards—I believe counsel is correct that the deal did not finalize, but a letter of intent I believe or a contract was moved towards—on that site, the 90 acre site you spoke of that Homart would in fact purchase and develop something on it."

The Homart "option" purchase price was not mentioned at trial. In conclusion, Barofsky's opinion was that the highest and best use after the take was office.

The plaintiff cites *Brookwood Land Venture* (199 Ill. App. 3d at 977) to stand for the proposition that once the defendants raised the issue of demand in the area as a factor in determining highest and best use, the plaintiff was entitled to respond by introducing evidence that rebutted the defendants' evidence. However, in its brief, plaintiff fails to address the law cited by the defendants regarding the admission of a terminated option as evidence in a valuation proceeding. Offers to purchase are not admissible unless the offer is *bona fide* and for cash. (*City of Chicago v. Harrison-Halsted Building Corp.* (1957), 11 Ill. 2d 431, 438.) An offer to purchase the condemned property which is received subsequent to the filing of the condemnation petition is considered inadmissible, and a trial court is right in excluding

it. (*Illinois State Toll Highway Authority v. Dicke* (1991), 208 Ill. App. 3d 158, 168-69.) The option at issue in the present case was terminated and was post-condemnation.

■ On the basis of the statement excerpted above, we determine that the evidence was not relevant. That is, it did not tend to prove the matter sought to be proved. We determine that this is so because Barofsky's statement was so general, *i.e.*, "a contract was moved towards," that it did not tend to prove that an option was entered into by Homart, and *ergo* there was demand in that area for commercially zoned land. Since it was not relevant, its admission was error.

However, we determine that its admission was harmless error. We so decide because the evidence that Homart expressed an interest in the land, in the absence of evidence that it acted upon that interest by purchasing or developing the land, is ambiguous and could serve as a benefit or detraction with respect to the plaintiff's case. That is, if the jury gathered from Barofsky's statement that Homart was getting ready to develop the land, then plaintiff's case for demand for office or commercial would be supported. However, if the jury noted that no actual contract or development had been attested to, then it could conclude that the subject land was not likely to be rezoned commercial or office, a conclusion which would undercut the plaintiff's case. Thus, because such evidence could cut either way, we decide that its admission was harmless error.

The defendants next assert that the trial court committed reversible error by denying the defendants' motion *in limine* No. 2 requesting the exclusion of references to "Gallagher" and "Gallagher & Henry" by name in a way designed to show the Gallagher land holdings and wealth and thereby prejudicing the jury against the defendants. The plaintiff argues that it was the defendants that referred to Gallagher and his land holdings more than the plaintiff. Furthermore, the plaintiff asserts that when it did refer to Gallagher and his land holdings, such references were limited to clearly permissible areas of testimony, such as references in order to show bias and highest and best use.

■ The briefs document numerous references by plaintiff's attorney to Gallagher, as well as quite a few references by the defendants' attorney and witnesses. However, most of those were mere references by name to actions that Gallagher took which would not convey his wealth or land holdings. Other instances were references to Gallagher with respect to the subject property and also would not lead the jury to infer that Gallagher had extensive land holdings or great wealth. However, in examining the record, we note that the plaintiff's attor-

ney referred to Gallagher by name several times in connection with properties in the area of the subject property that were not comparable sales. While at first glance such references appear prejudicial, we determine that, indeed, they were not. Each of those references may be justified by the fact that the plaintiff was trying (1) to show evidence of bias or motive, (2) attack the credibility of Gallagher as a witness, (3) show that the area in which the subject property was located was not in need of more multiple-family zoning, or (4) that the multiple-family zoned land in that area was being rezoned to other uses. Such limited use of the Gallagher name with respect to his properties is justified and proper. We thus determine that the trial court did not err in denying defendants' motion *in limine* No. 2.

■ In addition, the defendants make the argument that the jury verdict was the result of prejudice fostered by error and thus the verdict must be reversed. The defendants' arguments for this assertion are, for the most part, the arguments represented in this disposition, *i.e.*, that certain evidentiary errors occurred and thus the verdict should be reversed. Where an award is made by a jury in an eminent domain proceeding in which the evidence is conflicting and the jury views the property and fixes the amount of compensation within the range of the evidence, the verdict will not be disturbed unless there has been a clear and palpable mistake or a showing that the verdict was a result of passion or prejudice. (*City of Freeport v. Fullerton Lumber Co.* (1981), 98 Ill. App. 3d 218, 223-24.) Clearly the evidence was conflicting in this case, and the jury did see the subject property. In this section of their brief, the defendants present us no new rationale for determining that reversible error occurred, or that the verdict was a result of passion or prejudice. On this basis, we affirm the verdict.

Having addressed the defendants' evidentiary issues, we now address the issue of interest on the excess compensation. The defendants contend that they should not be required to pay interest on any excess preliminary compensation until final adjudication of just compensation has occurred by issuance of this court's mandate, and until the requirements of section 7—109 of the Eminent Domain Act (Act) are properly met. Section 7—109 requires that the court order the excess compensated party to refund such excess to the clerk of the court, and if the refund is not made within a reasonable time fixed by the court, then the court shall enter a judgment for such excess in favor of the plaintiff and against such party. (Ill. Rev. Stat. 1987, ch. 110, par. 7—109.) The defendants cite case law which it claims stands for the proposition that, due to the fact that the defendants filed a

timely post-trial motion from the judgment entered on December 19, 1991, the time set by the trial court for refund of excess preliminary compensation is stayed until the judgment for final just compensation is affirmed and the appellate court mandate issues. The plaintiff asserts that the trial court properly entered judgment in favor of the plaintiff on the excess compensation after the defendants refused to return the money.

Interest in Illinois is not recoverable unless contracted for or authorized by statute. (*New Century Engineering & Development Corp.*, 97 Ill. 2d at 352.) The only portion of the Act providing for the payment of interest is found in section 7–108, which requires the plaintiff to pay interest on any excess compensation finally adjudged over the amount of preliminary just compensation. (Ill. Rev. Stat. 1987, ch. 110, par. 7–108; *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.* (1992), 225 Ill. App. 3d 567, 570.) The part of the Act which is concerned with the refund of excess compensation, section 7–109, does not provide for interest on any amount by which the preliminary compensation exceeds the final compensation.

Section 7–109, states:

> "Refund of excess of deposit. If the amount withdrawn from deposit by any interested party under the provision of Section 7–106 of this Act exceeds the amount finally adjudged to be just compensation (or damages, costs, expenses, and attorney fees) due to such party, the court shall order such party to refund such excess to the clerk of the court, and if refund is not made within a reasonable time fixed by the court, shall enter judgment for such excess in favor of the plaintiff and against such party." Ill. Rev. Stat. 1987, ch. 110, par. 7–109.

An issue similar to the interest issue in the present case was raised in *Heritage Standard Bank* (225 Ill. App. 3d 567). At issue in that case was whether section 7–109 requires a judgment to be entered by the trial court for any excess preliminary compensation, in addition to the order entered for refund, before interest may be awarded on that amount. That court, relying on *New Century* and section 7–109, reasoned that a judgment must be entered before interest may be awarded on excess preliminary compensation. (*Heritage Standard Bank*, 225 Ill. App. 3d at 573.) We follow the rationale of that case in disposing of this issue.

■■■ In the present case, judgment on the jury's verdict was entered by the trial court on December 20, 1991. As a result of the jury verdict, the award of preliminary compensation withdrawn by defendants on August 26, 1987, exceeded the award of final compensation

by $1,815,750. The court then entered an order on January 17, 1992, wherein the court provided that the defendants had until April 16, 1992, to refund the excess. The court continued the cause to April 20, 1992, to ascertain compliance with the order. On April 20, 1992, the trial court ascertained that the defendants had failed to refund the excess compensation within the reasonable period fixed by it and entered judgment in favor of the plaintiff on the excess compensation. On May 15, 1992, the trial court entered, *nunc pro tunc* April 20, 1992, a judgment under section 7—109 and vacated the order entered April 20, 1992. The May 15, 1992, order denied plaintiff's prayer that judgment be entered effective August 26, 1987, or, in the alternative, effective April 16, 1992, with interest accruing from such respective dates. In addition, it entered judgment *nunc pro tunc* April 20, 1992, in favor of plaintiff on the excess compensation, finding that interest on the excess at 9% per annum was $447.72 *per diem*. We determine that under section 7—109, and *Heritage Standard Bank*, that the May 15, 1992, judgment properly serves as the requisite judgment satisfying section 7—109 and that the trial court properly decided that interest on the excess was to accrue from April 20, 1992, until the date the excess is returned to the plaintiff.

The defendants cite *City of Winchester v. Ring* (1925), 315 Ill. 358, *Town of Libertyville v. Moran* (1989), 179 Ill. App. 3d 880, and *County Board of School Trustees v. Boram* (1962), 26 Ill. 2d 167, to stand for the proposition that the filing of the post-trial motion requesting that the December 19, 1991, judgment be set aside stays all proceedings in execution of the judgment and such stay remains in effect until such time as the judgment for final compensation is affirmed and the appellate court mandate issues. The defendants also cite *County of Cook v. Malysa* (1968), 39 Ill. 2d 376, and *Department of Public Works & Buildings v. Forbeck* (1969), 118 Ill. App. 2d 231, for the proposition that, under Illinois law, defendants cannot refund excess preliminary compensation without waiving their right of appeal. Those five cases are not applicable in the present case, as none of those cases involved condemnation under the quick-take provisions of the Code of Civil Procedure. Thus, those cases did not interpret section 7—109, and we thus follow *Heritage Standard Bank*.

■■■ Plaintiff, in its cross-appeal, argues that the trial court erred in finding that the plaintiff was entitled to interest on the excess compensation only during the period subsequent to the entry of judgment on the excess. The plaintiff cites foreign jurisdiction case law which supports the proposition that the property owners should be compelled to pay interest on the excess from the date of withdrawal by the

property owners. We again follow the *Heritage Standard Bank* rationale, which leads us to conclude that the interest on the excess should accrue from the date the judgment against the defendants was entered, April 20, 1992.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

QUETSCH and COLWELL, JJ., concur.