**In re LIFSCHULTZ FAST FREIGHT, d/b/a Lifschultz Corp., Debtor.**

**Bruce De'MEDICI, not individually but as Trustee of Lifschultz Fast Freight Corporation, d/b/a Lifschultz Corporation, Plaintiff/Appellant,**

**v.**

**SALSON EXPRESS COMPANY, Defendant/Appellee.**

**No. 95 C 3528.**

United States District Court, N.D. Illinois, Eastern Division.

Jan. 19, 1996.

Bruce E. De'Medici, Riordan, Larson, Bruckert & Moore, Chicago, IL, for appellant.

Anthony V. Ponzio, Chicago, IL, for appellee.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

This is an appeal from a decision of the bankruptcy court denying a trustee's adversary claim for equitable subordination of a creditor's $300,000 secured claim against debtor Lifschultz Fast Freight Corp. The trustee claims that the principals of the creditor, Salson Express Company ("Salson") are insiders who formed the debtor with insufficient equity capital. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).

The bankruptcy court found that the debtor was adequately capitalized. Payments by the debtor of sums used to reduce loans of the insiders was not misconduct or inequitable because the payments reduced the amount of the borrowings of the debtor. The dispute centers around the debtor's working capital requirements and the correct valuation of assets of the debtor, including a customer list acquired from the predecessor of the debtor.

The doctrine of equitable subordination recognizes the bankruptcy court's fundamental role as a court of equity, permitting the court to disallow or subordinate claims which, if recognized, would produce unjust results. *Pepper v. Litton*, 308 U.S. 295, 304–306, 60 S.Ct. 238, 244–245, 84 L.Ed. 281 (1939); *In re Octagon Roofing*, 157 B.R. 852 (N.D.Ill.1993). The doctrine is codified at 11 U.S.C. § 510(c):

Notwithstanding subsections (a) and (b) ..., after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to

all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

Equitable subordination is an unusual remedy and is applied only under limited circumstances. *In re CTS Truss, Inc.*, 868 F.2d 146, 148–149 (5th Cir.1989). Equitable subordination is appropriate when a claimant has engaged in conduct that resulted in injury to creditors or conferred an unfair advantage on the claimant and the use of equitable subordination is consistent with the Bankruptcy Code.

■ Proof of undercapitalization of a corporation may lead to equitable subordination if the claimant is an insider who makes a loan to the undercapitalized debtor. In such cases, the bankruptcy court may recast the loan as a capital contribution. *In re Octagon Roofing*, 157 B.R. at 857. Moreover, in this Circuit, creditor misconduct is not a necessary prerequisite for application of equitable subordination. *Matter of Virtual Network Services Corp.*, 902 F.2d 1246, 1249–50 (7th Cir.1990). The bankruptcy court's contrary statement is inconsistent with Seventh Circuit precedent dealing with the development of the doctrine of equitable subordination.

■ The standard of review to be applied by this court to the findings of fact of a bankruptcy court is set forth in Federal Rule Bankruptcy Procedure 8013. Such findings are reviewed for clear error, and deference is to be given to credibility findings. *In re Sheridan*, 57 F.3d 627, 633 (7th Cir.1995); *Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 178–79 (7th Cir.1994). As stated in *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1008 (7th Cir.1994), the clear error standard requires a reviewing court to distinguish between the situation in which it thinks that if it had been the trier of fact it would have decided the case differently and the situation in which it is firmly convinced that it would have done so. It is only in the latter case that it may do so, and the facts must support such a judgment.

■ Also relevant to a review of the facts in this case is the rule that the transactions of an insider with a debtor are subject to a more rigorous level of scrutiny than the dealings of an outside party. *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). When an insider's dealings with a debtor are challenged, a trustee must prove only the unfairness of the transaction. The burden then shifts to the insider to prove both the good faith and the fairness of the transaction.

■ The determination of capitalization for a business is an eminently practical matter which is informed by accounting data and customary business standards. When a going business is acquired and continued, past practice is important and estimates are confirmed or found faulty as the business continues.

The business life of debtor existed from March to November of 1990 when it was forced into a Chapter 11 reorganization by creditors. Prepetition debt was $2.6 million. Later, based on a study made by an expert accounting firm, the debtor went into a Chapter 7 liquidation.

In March of 1990, Lifschultz Fast Freight Corp. ("LFF") and the debtor applied to the Interstate Commerce Commission for a transfer of LFF's authority to operate as a motor carrier. Pertinent to the issues in this case, the application states:

LFF has had continuous losses over the past five years. A company founded in 1900, LFF has had a long and successfully continuous history in surface transportation, first as a freight forwarder, and subsequently, as a motor carrier. It has made a valiant effort to stay in business, but the losses incurred, primarily the result of discounting and the rate wars of the past four years by its competition in eastern-central and transcontinental traffic lanes, has forced LFF to take itself out of the daily long-haul operations.

In order to protect its personnel and business, LFF has decided to sell its business, including its 14 terminal operations throughout the United States, to a new corporation [the debtor] which is under common control with Sal–Son Trucking Company, Inc. (Sal–Son) [a corporation af-

filiated with the creditor].[1] Sal–Son has acted as LFF's agent in New Jersey for many continuous years. Sal–Son holds authority from this Commission in MC–30111. ... LFF desires to ultimately retain its operating rights, even though the entire LFF business, short of the local operations of LFF in New York City, will be taken over by [the debtor]. To the extent that the New York City operations of LFF will be continued by LFF as an agent to [debtor], LFF desires to retain its authority against the possibility that it will be called upon to expand its operating scope for [debtor] in the future, and for its continuing relationship as a connecting carrier.

The necessity for the foregoing action is seen in the following summarized operating results for LFF:

| (000) | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|
| Freight Revenue—Gross | $32,722 | $33,757 | $30,759 | $30,358 | $25,592 |
| Loss From Operations | (809) | (786) | (2,191) | (1,737) | (3,402) |
| Net Loss after other expenses | (399) | (734) | (2,043) | (2,824) | (5,496) |

The latest balance sheet of LFF, as of December 31, 1989, shows a deficit net worth of $3,142,905, an overcapitalized company with debt exceeding $7.4 million (as against no corresponding equity), and equipment depreciated to no appreciable book value.[2]

No balance sheet was prepared for the debtor either at the time of its formation or at any subsequent period; however, LFF recorded the transaction as a note to its financial statements as follows:

Pursuant to a contract dated March 12, 1990 [LFF] sold substantially all of its interstate trucking operations including fixed assets and intangible assets relating to its trucking operations. The terms included 20% ownership of stock in the [debtor] to [LFF] plus the [debtor] assumed certain liabilities relating to the trucking operations including all obligations arising out of or in connection with the transferred assets and any liabilities for accrued vacation time, accrued by employees prior to the date of sale.

| Assets Sold | |
|---|---|
| Property and equipment, at cost, less accumulated depreciation | $100,987 |
| Assets Sold | 100,987 |
| Liabilities Assumed Accrued vacation | 232,000 |
| Liabilities Assumed in Excess of Book Value | $131,013 |

Based on the foregoing presentation to the ICC and the stockholders of LFF, and giving consideration to $1,000 of equity capital contributed at the time of its organization, debtor can be described as starting business with $130,000 of debt in excess of assets. Debtor immediately incurred additional debt as a result of the amount it received as a secured loan from Salson.

For several years prior to its involvement with debtor, Salson was a dormant company. Its sole shareholders are Salvatore Berritto ("Berritto") and Sebastian DeMarco ("DeMarco"). Its office, located at 15 New York Avenue, Jersey City, New Jersey, became the office of debtor. In 1990, Berritto was president and DeMarco and Theodore Cohen were vice-presidents of Salson. Cohen is a son-in-law of Berritto. Cohen incorporated debtor in March of 1990 with an initial investment of $1,000 from Anthony Berritto, son-in-law of Berritto. The officers and directors were Cohen, Anthony Berritto, Michael DeMarco, Sebastian DeMarco's son, DeMarco, and Sidney Lifschultz. Stock ownership was distributed as follows: Berritto (25%); DeMarco (25%); Berritto's son (10%); DeMarco's son (10%); Cohen (10%) and LFF (20%).

---

1. Salvatore Berritto and Sebastian DeMarco owned or controlled Sal–Son Trucking Company.

2. David Lifschultz, who became a director of the debtor and later chairman of a creditors' committee, testified that LFF had real estate worth $10 million and was receiving rent of approximately $460,000 annually, and had $1.5 million in cash.

After March 12, 1990, debtor took over the cartage business which Salson Trucking Company of New Jersey ("Salson Trucking") previously provided to LFF in the New York area and leased its vehicles. Debtor also became liable for rentals at the terminals previously operated by LFF. Until May 15, 1990 all receivables earned by the debtor were sent to LFF.

The parties agree that from March of 1990 forward, debtor's weekly expenses were between $400,000 and $500,000. Debtor was without funds to meet its first payroll. Salson Trucking Co., Inc. paid $92,000 to LFF, and LFF then paid the first payroll. On March 13, 1990, debtor entered into a factoring agreement with Salson in which it granted Salson a security interest in all of its assets. On March 19, 1990, debtor, Salson and Salson Trucking Co. entered into an agreement for repayment of the payroll funds. Under the agreement's terms, the funds advanced by Salson to LFF would be treated as advancements from Salson.

Salson was a conduit through which Berritto, DeMarco, Demarco's son and LFF provided funds to the debtor. Between March 27, 1990 and April 10, 1990, $862,841 was deposited in Salson's bank account. The deposits came from these sources: LFF $500,-000; Demarco $155,092; Berritto $105,092; Central Express (a company controlled by Berritto and DeMarco) $42,611; Salson Trucking $40,045; DeMarco's son $20,000. Salvatore and Marylou Berritto and Sebastian and Joan DeMarco executed a $500,000 note mortgage in favor of LFF and Berritto and DeMarco each borrowed $100,000 from a bank.

On August 10, 1990, debtor entered into an agreement with Ambassador Factors for a loan of $1,000,000 on its receivables. Pursuant to the agreement, the indebtedness which remained due under the Salson loan agreement was subordinated to that of Ambassador Factors, and Berritto, DeMarco and Cohen were each required to provide a personal guaranty. From the proceeds, $700,000 was deposited in debtor's account and $300,000 was remitted to LFF. On August 13, debtor transferred $150,000 to Salson. Salson transferred $100,000 to LFF and $50,000 to Salson Trucking Co.

On November 6, 1990, $100,000 was wired from debtor to a Salson account. Berritto utilized the sum to remit two $50,000 payments to credit his and DeMarco's outstanding loan balances. On November 13, 1990, $60,000 was transferred from debtor to Salson. On November 19, 1990, an additional $40,000 was transferred from debtor to Salson.

From March 21 through October 31, 1990, debtor's month end average debt balance was $935,643.

On November 20, 1990, an involuntary petition was filed against debtor pursuant to Chapter 11 of the Bankruptcy Code.

On November 21, 1990, Berritto remitted the proceeds of the November 13 and 19 transfers as final payment on the loans he and DeMarco had made.

After Chapter 11 proceedings began, the unsecured creditors committee engaged the national accounting firm of Coopers & Lybrand to assess the debtor's operations and financial situation. Ms. Nancy Ross managed the engagement for Coopers & Lybrand. At that time she was a director in charge of the bankruptcy services area of the reorganizations group at the firm. Ms. Ross is a certified public accountant and is also one of a small group of public accountants who are also certified as reorganization and insolvency accountants.

Coopers & Lybrand examined the debtor's records and interviewed its chief accountant and officers. Its report showed as follows:

Operating Statements—November 1989 through October 1990
(Dollars in Thousands)

|  | NOV '89 | DEC '89 | JAN '90 | FEB '90 |
|---|---|---|---|---|
| NET SALES | 1,956 | 1,638 | 1,541 | 1,600 |
| TOTAL COST OF SALES | 1,349 69% | 1,240 76% | 1,236 80% | 1,096 69% |
| OPERATING MARGIN | 607 31% | 398 24% | 305 20% | 504 31% |
| ADM EXPENSES | 1,035 | 1,142 | 1,151 | 1,118 |
| NET PROFIT (LOSS); | (428) | (318) | (846) | (614) |

|  | MAR '90 | APR '90 | MAY '90 | JUNE '90 |
|---|---|---|---|---|
| NET SALES | 1,966 | 1,682 | 1,703 | 1,970 |
| TOTAL COST OF SALES | 1,259 64% | 1,060 63% | 978 57% | 1,107 56% |
| OPERATING MARGIN | 707 36% | 622 37% | 725 43% | 863 44% |
| ADM EXPENSES | 1,048 | 779 | 889 . | 922 |
| NET PROFIT (LOSS): | (341) | (157) | (164) | (59) |

|  | JULY '90 | AUG '90 | SEPT '90 | OCT '90 |
|---|---|---|---|---|
| NET SALES | 1,813 | 2,289 | 1,928 | 2,073 |
| TOTAL COST OF SALES | 1,096 60% | 1,314 57% | 1,218 63% | 1,279 62% |
| OPERATING MARGIN | 717 40% | 975 43% | 710 37% | 794 38% |
| ADM EXPENSES | 988 | 963 | 1,021 | 1,047 |
| NET PROFIT (LOSS): | (271) | 12 | (311) | (253) |

Coopers & Lybrand examined a number of business scenarios, none of which showed that the company would be profitable. It noted that to achieve a break-even operation, sales level would have to increase to $1.8 million per month which, at the time of this report, would have been an increase of about 100%. The report was accepted by all parties and the case was converted to a proceeding under Chapter 7 of the Bankruptcy Code. David Lifschultz, the chairman of the unsecured creditors committee, found the Coopers & Lybrand report to be accurate.

In June 1992, the trustee retained Coopers & Lybrand to analyze the Salson claim and the adequacy of the debtor's capitalization. Ms. Ross was the manager of this engagement. Ms. Ross submitted a report and testified that the debtor was not adequately capitalized from its inception to generate the sales in which it was engaged. She found that the debtor began business with a negative net worth and without sufficient liquid capital to pay liabilities. In arriving at that conclusion she considered whether the customer list acquired from LFF should be given any capital value and determined that it had none.

■ Salson claims the customer list was worth at least $900,000 based on testimony of David Lifschultz which the bankruptcy judge appeared to reject at the hearing. Also, according to the testimony of Attorney David Millner, who represented LFF and the debtor before the ICC, LFF had some conversations with a representative of Pacific International Express about selling its customer list. However, no bona fide offer was ever made, and the bankruptcy judge correctly appeared to give Millner's testimony no weight during the hearing. *Illinois State Toll Highway Authority v. Standard Bank and Trust Co.,* 250 Ill.App.3d 665, 189 Ill. Dec. 272, 619 N.E.2d 1321 (2nd Dist.1993); *Forest Preserve District of DuPage County v. Brookwood Land Venture,* 199 Ill.App.3d 973, 146 Ill.Dec. 38, 557 N.E.2d 980 (2nd Dist.1990).

Scott Peltz, a certified public accountant, was called as an expert witness on behalf of

Salson. Mr. Peltz was present for the testimony of Ms. Ross and conferred with Messrs. Lifschultz, Millner and Cohen. He did not review the records of the debtor or prepare any reports on the financial condition of the debtor. He did not express any opinion as to the value of the customer list; however, he was of the view that it should have been valued for capitalization purposes.

■ The customer list was never carried on the books of either LFF or debtor as having any value. Because of the five years of losses by LFF and the ensuing losses of debtor Ms. Ross's report and her testimony that the list was without value is strongly supported and was not overcome by any competent contrary opinion testimony. Unsupported opinion is not entitled to any weight. *Mid–State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989); *Brooke Group v. Brown & Williamson Tobacco*, 509 U.S. 209, ——, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993).

■ Based on a review of LFF's financial statements, debtor's cash requirements to generate sales, its need for factoring its receivables, and the capitalization of similar companies, Ms. Ross testified concerning the level of equity capital debtor required when it sought to continue the motor carrier business of LFF.

Sales of the business of LFF and debtor for twelve months ending October 31, 1990 were $22.1 million. Financial data contained in the *Transportation Technical Services (TTS) Blue Book of Trucking Companies*, 1990–91 Edition, show that, on average, companies with between $5 and $25 million in revenues have a capital structure which is 42% equity and 58% debt and a total capitalization of $3.7 million.

During the nine months it conducted business, debtor's debt ranged between approximately $850,000 to approximately $1,500,000. Ms. Ross imputed the equity capital required to conduct the debtor's business to be between $490,000 and $870,000 and its total allowable debt capital to be between $357,000 to $630,000, far less than the $850,000 to $1,500,000 debt capital debtor carried. Even

more equity capital than the imputed amount was required since debtor, as a turn around company, would be expected to continue to suffer losses. Ms. Ross stated that actual expenditures are also an indication of what the debtor's cash needs would be.

Salson and its witnesses attacked the use of *TTS Blue Book* statistics on the grounds that the compared companies are motor carriers rather than freight-forwarders who require less investment in vehicles; that debtor was a freight-forwarder and actually had fewer vehicles than did the compared companies, and the financial similarities found were only coincidental. Ms. Ross testified that the operating difference would not invalidate the comparison because the cost of the necessary vehicles would be passed on in increased freight charges or incurred in other ways. Specific support for her position is found in the first Coopers & Lybrand report. After the LFF transaction, debtor began renting trucks from a Salson related company. Truck rental expense increased from $53,000 per month in March of 1990 to $144,000 per month in October of 1990. Also, David Lifschultz testified that ninety percent of LFF's business had been as a freight-forwarder, which further validated consideration of its margins and costs in an analysis of debtor's capital requirements. Finally, since the operating margins and administrative expenses of the business before and after the change of ownership are within the same range and continued to produce losses, more than mere coincidence is shown.

■ Salson also argues that Ms. Ross also erred in failing to include as equity capital the value of certain Los Angeles Dodgers' baseball tickets (including the right to renew) which were sold for $47,000 and the value of debtor's interest in a Commerce, California long term lease which was sold by the estate for $292,500. As the trustee points out, these proceeds establish values in liquidation. They do not suggest capital value for a going business. Indeed, to a going business each asset represents a cash cost in the form of an admission price or current rental ($30,000/month). Ms. Ross did not err in omitting the liquidation values in the calculation of the debtor's available capital.

720

Other evidence that debtor had insufficient equity capital is shown by the subordination of its debt and the conditions imposed by lenders. LFF did not loan any money directly to debtor. It lent $500,000 to Salson, but required mortgages from Berritto and DeMarco, and was quickly repaid $300,000 from the proceeds of the Ambassador loan on debtor's receivables. Ambassador required as conditions of its loan that the Salson loan be subordinated and that the principals provide personal guaranties of the loan. While no one condition, taken individually, is decisive, taken together with the ever deteriorating condition of the debtor, this, also, is strong evidence of the undercapitalization of the debtor.

On this record it must be concluded that the bankruptcy court committed clear error when it determined that the debtor was adequately capitalized at its inception. The conclusion was based upon testimony which the court correctly ruled inadmissible as well as on other testimony which is unsupported and contradicted by facts in the record.

The insiders' withdrawal of $300,000 from the proceeds of the Ambassador loan and $200,000 from the debtor to pay their personal bank loans at a time when debtor was going further and further into debt is clearly the kind of inequitable conduct which cast the burden on them to prove the justness and fairness of their conduct. It was not proved by simply showing that the withdrawal of funds reduced the debtor's borrowings. Such a reduction was trivial compared to the need of the debtor for funds and in no way assisted its survival. Other proof of "misconduct" is not required. *Matter of Virtual Network Services Corp.*, 902 F.2d at 1249–50.

Since the debtor was unquestionably undercapitalized by substantially more than the outstanding Salson loan, the Salson loan must be treated as equity capital and subordinated to that status for purposes of administering the debtor's estate.

IT IS THEREFORE ORDERED that the clerk of the court enter a judgment reversing the judgment of the bankruptcy court and remanding this case to the bankruptcy court with directions to subordinate the claim of Salson Express Co., Inc. for purposes of administering the debtor's estate.