2020 IL App (1st) 190787-U

THIRD DIVISION
December 30, 2020

No. 1-19-0787

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 L 50185 |
| STANDARD BANK AND TRUST COMPANY, as Trustee under Trust Agreement dated April 18, 1966, known as Trust No. 2860, GALLAGHER & HENRY, | ) ) ) ) ) | Honorable Michael F. Otto, |
| Defendants-Appellants. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1   *Held*:   The judgment of the circuit court of Cook County is affirmed in part, reversed in part, and the cause remanded for a new trial; defendants made a sufficient showing of a reasonable probability of rezoning in support of its expert appraisers' highest and best use determinations and thus the trial court committed reversable error in barring defendants' experts and their opinions regarding just compensation for the taking of defendants' property.

¶ 2   The Illinois Department of Transportation, plaintiff, filed a condemnation complaint pursuant to the Illinois Eminent Domain Act, 235 ILCS 30/1-1-1 (West 2012), to acquire 7.252 acres of property (Subject Property) owned by defendants for a public use. In advance of the

trial, solely for purposes of determining just compensation for the taking of the Subject Property, the parties exchanged expert witness appraisals opining as to the fair market value of the Subject Property. Both parties subsequently filed motions *in limine* seeking to bar the other party's expert appraisal opinions. At issue in this case are plaintiff's five motions *in limine* granted by the trial court barring defendants' experts' appraisal opinions. In granting the motions, the trial court found there was no substantial showing of a reasonable probability of rezoning the property for commercial use, which the court reasoned was required to support the defendants' experts' valuation opinions as to the highest and best use of the Subject Property and barred the evidence from being submitted to the jury. Defendants sought leave to disclose supplemental witness opinions which they argued conformed to the trial court's rulings on plaintiff's motions *in limine* which the trial court denied. The effect of the trial court's pretrial rulings was to bar defendants from presenting any valuation opinions.

¶ 3　　Also at issue are two motions *in limine* filed by defendants which alleged plaintiff's experts' opinions were based on consideration of inappropriate documents and thus should be barred. The defendants' motions were denied by the trial court.

¶ 4　　Following a bench trial which included only plaintiff's valuation evidence, the trial court entered a judgment finding just compensation for the Subject Property to be in the amount determined by plaintiff's appraisers' in their valuations. Defendants moved for a new trial which was denied by the trial court. Defendants timely appealed these pretrial and posttrial rulings. For the reasons set forth below, we affirm in part, reverse in part, and remand for a new trial.

¶ 5　　　　　　　　　　　　　　BACKGROUND

¶ 6　　On February 19, 2013, plaintiff, the Illinois Department of Transportation of the State of Illinois, filed a Complaint for Condemnation pursuant to the Illinois Eminent Domain Act, 235

ILCS 30/1-1-1 (West 2012), seeking to acquire a 7.252 acre portion of real property owned by defendants, Standard Bank and Trust Company and Gallagher & Henry. According to plaintiff's construction plans, the purpose of this acquisition was to allow for road widening, stormwater detention, and compensatory floodplain storage.

¶ 7                                History of Subject Property

¶ 8     The Subject Property sought by plaintiff is located in the approximately 127 acre parcel of land owned by defendants and identified as the Hitz, Kaufman, Sayers II Parcel (Kaufman Parcel). The Subject Parcel is an irregular "L" shape located at the southwest quadrant of Wolf Road and 159th Street in Orland Park and excludes a rectangular shaped area where Wolf Road and 159th Street intersect. The Subject Property includes approximately 1,154 feet of frontage along the south side of 159th Street and approximately 1,670 feet of frontage along the west side of Wolf Road. At the time of plaintiff's complaint, the Subject Property was vacant land used for agricultural production.

¶ 9               Spring Creek Annexation Agreement and Ordinance

¶ 10     In 1994, approximately 1,500 acres of land which included the subject Kaufman Parcel and 13 other parcels was annexed into the Village of Orland Park, Illinois (Village) pursuant to an annexation agreement referred to as the Spring Creek Annexation Agreement (Annexation Agreement). The Annexation Agreement was subsequently adopted by the Village in an ordinance (Ordinance 2515).

¶ 11     The Annexation Agreement adopted by Ordinance 2515 zoned the annexed Spring Creek property as a Large Scale Planned Development (LSPD) which allows for various uses with both residential uses (including single and multiple family residential) and commercial uses (including grocery stores and restaurants).

¶ 12    Exhibit D to the Annexation Agreement (entitled Parcel Schedules) incorporates a "Proposed Concept Plan of Development" for the Kaufman Parcel under the LSPD (Concept Plan).  The Concept Plan allows for five different land uses on the Kaufman parcel including both residential and commercial.  Exhibit D sets forth "Parcel Design Standards" and states "[f]lexibility in determining the final location of the five (5) land uses allowed within the [Kaufman parcel] is an essential ingredient of the Concept Plan."

¶ 13    Appended to exhibit D is a "Parcel Concept Map" of the Kaufman Parcel.  The map is described in exhibit D and states as follows:

> "The appended map of the subject parcel is a preliminary land use concept.  As such, but within the foregoing design standards, this parcel concept map is subject to revision, amendment or modification as Owner/Developer may hereafter deem consistent with the need for excellence of final design and this Agreement.  Its map symbols and indications are only conceptual illustrations and, therefore, are neither dispositive of the final locations of said parcel's allowed land uses, its use boundaries nor its environmental features.  All such matters are reserved for final determination upon Owner/Developer's plat submissions."

¶ 14    As set forth in exhibit D, the Subject Property is located within the Kaufman Parcel.  The Subject Property contains only designations for residential use and vacant land as depicted in the Parcel Concept Map.  Outside the Subject Property but within the Kaufman Parcel, the Parcel Concept Map also provides for commercial development.  This commercial development is located on the map along 167th Street and Wolf Road.  A total of 10.6 acres of commercial property use is allotted for within the Kaufman Parcel as set forth in the "Table of Proposed Uses" contained in group exhibit C to the Annexation Agreement.

¶ 15    Section 7 of the Annexation Agreement titled "Planned Development – Concept Plan for Subject Property" provides for development of the annexed Spring Creek property. Section 7(B) titled "Uses; Parcel Concept Plan; Design Standards" notes the parcel concept plans and design standards in exhibit D and states as follows:

> "Many of such parcels have multiple uses permitted under the Land Development Code, and multiple densities encompassed within the overall planned development. The parties hereto recognize that it is impractical to identify and describe each of these areas or districts in detail in this Agreement. Accordingly, Owner/Developer shall be free to identify the location and configuration of those districts or areas at the time of submission of preliminary plats, so long as they substantially comply with the text of Group Exhibit 'D' and this Agreement."

¶ 16    Provision 7(E) titled "Commercial/Business" provides for business or commercial development under the "BIZ" or "RSB" classification and references the Subject Property as follows:

> "[Kaufman Parcel] – 10.0 acres – BIZ or RSB District (plus 40.0 acres of apartments as part of a town center project)."

¶ 17    The provision generally discusses such business and commercial uses stating:

> "Any commercial or business use presently or hereafter allowed as a permitted use under the RSB Residential and Supporting Business District and BIZ General Retail District zoning provisions of the Land Development Code of the Village shall be permitted to be constructed on the above parcels without the necessity of further hearings or rezoning (except such plat or plan review proceedings as may be otherwise required herein)."

¶ 18                                    Trial Court Proceedings

¶ 19                                       Expert Appraisals

¶ 20    After the filing of its complaint, plaintiff was granted title to the Subject Property.

Thereafter, the parties exchanged expert witness opinions from their appraisers valuing the

Subject Property. Plaintiff's appraisers concluded the highest and best use was residential

development. Plaintiff's two appraisal witnesses both opined $250,000 as a just compensation

valuation.

¶ 21    Defendants' two appraisal witnesses estimated just compensation to be between $900,000

and $1,025,000. The primary difference between plaintiff's and defendants' appraised

valuations is the highest and best use assigned to the Subject Property by the appraisers in their

valuations.

¶ 22    Defendants' appraisers considered the Subject Property's highest and best use to be

commercial development. Plaintiff's appraisers concluded the highest and best use was

residential development. Both defendants' appraisers, Dale Kleszynski and Mary Linberger,

testified at their depositions they relied on the Annexation Agreement's flexibility language in

ascertaining their determination as to commercial being the highest and best use of the Subject

Property and their conclusion that there was a reasonable probability the Village would approve

reconfiguration consistent with this highest and best use.

¶ 23    Assistant Village Manager, Karie Friling, testified during her deposition about the

Village's exercise of flexibility under the Annexation Agreement with respect to the

development of two different Spring Creek parcels. Specifically, the Village accommodated a

deviation from the Calvert Parcel's concept plan from 8,000 square-foot single-family home uses

to townhome uses. The Village also accommodated deviation from the Ranquist Parcel's

- 6 -

concept plan with respect to the configuration of townhomes and apartments. Village lawyer, Kenneth Friker, also discussed the Village's approval of these modifications as well as Village approval that had been given for the Long Run Creek Parcel to deviate from the Annexation Agreement's Concept Plan with respect to the number of condos and single-family units so long as the developer remained within the maximum units permitted under the Agreement.

¶ 24                                              Pretrial Motions

¶ 25     Prior to the just compensation trial, the parties filed various motions *in limine*. Relevant to this appeal are five of plaintiff's motions *in limine* (individually plaintiff's Motion 1, 2, 3, 4, and 8; collectively "plaintiff's Motions"). Plaintiff's Motions sought to exclude all evidence assigning a commercial development use to the Subject Property which would increase the value of the property. Plaintiff's Motion 1 sought to bar defendants from presenting "any evidence, opinions, or arguments that Ordinance No. 2515 could be amended to allow for commercial development on the Subject Property as of the date of value." Plaintiff's Motion 2 sought to bar "evidence, opinions or testimony relating to the engineering report of McBride Engineering Inc." Plaintiff's Motion 3 sought to bar "the opinions of Defendant's appraisers, Mary Linberger and Dale Kleszynski" because their expert opinions provided for commercial development on the Subject Property. Plaintiff's Motion 4 sought to bar any 213(f)(3) witness opinions as to damages based on commercial development of the Subject Property. Plaintiff's Motion 8 sought to bar "evidence or testimony from Village employees or agents expressing any opinions," specifically Village employees Friling and Friker.

¶ 26     Two of defendants' motions *in limine* are also relevant to this appeal (individually defendants' Motion 2 and 3; collectively "defendants' Motions"). Defendants' Motions sought to exclude plaintiff's expert appraisal opinions prepared by Nicholas Solano and Fred Tadrowski

arguing they improperly relied on a document referred to as the 2013 Orland Park Comprehensive Plan (2013 Comprehensive Plan) prepared by the Village which expressly referenced the proposed taking project at issue in this case. Additionally, defendants sought to exclude Solano's appraisal because Solano's valuation opinion was based on his finding the subject property was in a flood plain. Defendants argued the opinion was based on an unreliable map of the floodplain. Following a hearing, on September 26, 2018, the trial court entered an order granting plaintiff's Motions and denying defendants' Motions.

¶ 27    The trial court granted plaintiff's Motions on the grounds that allowing valuation evidence based on a highest and best use which included commercial development of the Subject Property would result in a windfall to defendants. Noting just compensation is intended to place the property owner in no better or worse position than it occupied before the taking, the trial court reasoned that because the property taken by plaintiff was located outside the 10.6 acres approved for commercial use on the Parcel Concept Map of the Kaufman Parcel in exhibit D, defendants would still retain approval to develop the 10.6 commercial acres even after the taking. Thus, the trial court concluded, compensating defendants for 7.2 commercial acres would result in a windfall given the 10.6 commercial acres on which defendants would still be able to develop after the taking.

¶ 28    In denying defendants' Motions, the trial court acknowledged the 2013 Comprehensive Plan's awareness of the taking project but concluded plaintiff's experts' valuations were not based on the takings project. The trial court further ruled Solano relied on floodplain maps in his valuation which were among the types of documents generally relied on by appraisers and concluded it was for the trier of fact to assign what weight the valuation should be given.

¶ 29    On October 1, 2018, defendants filed a motion to reconsider the trial court's rulings on the motions *in limine* which was denied on October 2, 2018.  In a subsequent ruling, the trial court further clarified its granting of plaintiff's Motions *in limine* stating even without windfall, plaintiff's Motions would still be granted because defendants failed to show a reasonable probability the Subject Property's 159th Street frontage would have been approved by the Village for commercial use.

¶ 30    On October 4, 2018, defendants filed a motion for leave to disclose supplemental witness opinions which defendants argued conformed to the trial court's rulings on plaintiff's Motions. Defendants attached to the motion a supplemental valuation opinion prepared by appraiser Linberger valuing the Subject Property at $812,000.  On October 5, 2018, the trial court denied defendants' motion for leave to disclose the supplemental valuation opinion concluding that allowing the supplemental valuation two court days before trial would prejudice plaintiff; and, the court further stated, the valuation referenced an expectation that the subject property would be developed for commercial uses which the trial court indicated did not comport with its prior ruling on plaintiff's Motions.  The effect of the trial court's pretrial rulings was to bar defendants from presenting any valuation opinions from its expert witnesses and all evidence of a commercial development highest and best use for the Subject Property.  Therefore, the parties agreed to conditionally waive a jury trial on just compensation but reserved their right to a jury trial in the event of a remand following an appeal.

¶ 31                                    Trial

¶ 32    On October 9, 2018, a bench trial was held.  Over defendants' objection, plaintiff presented its valuation evidence.  Based on plaintiff's valuations, the trial court entered a

judgment on October 9, 2018 ordering plaintiff to pay defendants $250,000 as final just compensation for the Subject Property.

¶ 33    Defendants moved for a new trial which, after a hearing, was denied in a summary order entered on November 11, 2018.  The transcript from the hearing on defendants' motion for a new trial was not made a part of this record.

¶ 34    Thereafter, defendants timely appealed.  This appeal followed.

¶ 35                                    ANALYSIS

¶ 36    Both the federal and state constitutions allow for eminent domain and state "private property shall not be taken without payment of just compensation."  *City of Quincy v. Diamond Construction Company*, 327 Ill. App. 3d 338, 343 (2002).  Just compensation was described by our supreme court in *Forest Preserve District of Cook County v. Lehmann Estate, Inc.*, 388 Ill. 416 (1944), as follows:

> "Just compensation means such a sum of money as is the equivalent of the value of the property.  [Citation.]  Nothing short of the amount of money necessary to put the owner in as good condition financially as he was with the ownership of the property will satisfy the constitutional and statutory requirement of just compensation.  [Citation.]  The measure of compensation for the land taken must be its fair cash market value for the highest and best use to which it is available, even if, at the time of filing the petition, the land is not being put to such use.  [Citation.]"  *Id*. at 424.

¶ 37    The fair cash market value of the property at its highest and best use is determined as of the date of filing of the complaint to condemn.  *City of Quincy*, 327 Ill. App. 3d at 343.  The only

question for the trier of fact to decide in an eminent domain case is the just compensation owed to the owner of the property to be condemned. *Id.*

¶ 38    On appeal, defendants contend the trial court abused its discretion by granting plaintiff's Motions in *limine* and denying defendants' Motions in *limine*. A trial court has broad discretion to grant or deny a motion *in limine* which will not be reversed absent a clear abuse of discretion. *Id.* at 342-43. Furthermore, foundational challenges to admission of expert testimony are also reviewed for abuse of discretion. *People v. Williams*, 238 Ill. 2d 125, 136 (2010). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Patrick*, 233 Ill. 2d 62, 68 (2009). An abuse of discretion will also occur when the court applies the wrong legal standard. *In re Marriage of Betsy M*, 2015 IL App (1st) 151358, ¶ 46.

¶ 39                    Plaintiff's Motions *in Limine*

¶ 40    The trial court offered two explanations for its ruling granting plaintiff's Motions which barred all evidence of commercial development of the Subject Property: (1) defendants failed to show a reasonable probability the Subject Property would have been rezoned by the Village for commercial use if requested; and (2) a valuation based on commercial uses would be a windfall to defendants who would be compensated for 7.2 acres based on commercial use but would not be prevented from developing its remaining property for commercial use, which the Annexation Agreement capped at 10.6 acres.

¶ 41    With respect to the trial court's granting of plaintiff's Motions *in limine*, defendants argue (1) they did establish a reasonable probability the Village would rezone the Subject Property for

commercial development and (2) the admission of defendants' valuation opinions and evidence of a commercial development highest and best use would not result in a windfall.

¶ 42                                    (1) Reasonable Probability of Rezoning

¶ 43    A jury may consider the reasonable probability of a zoning change in determining a property's highest and best use. *Department of Public Works & Buildings v. Exchange National Bank*, 31 Ill. App. 3d 88, 105 (1975). "It is the trial court's responsibility to make a preliminary determination that there is sufficient evidence to establish a reasonable probability of rezoning so as to permit expert opinions of value based upon that probability." *Department of Public Works and Buildings v. Kelly*, 40 Ill. App. 3d 896, 902 (1976). To establish a reasonable probability of rezoning, it is improper to present a witness offered solely to provide an expert opinion on whether the governing entity will grant rezoning. *Lombard Park District*, 103 Ill. App. 2d at 11; *Western National Bank of Cicero*, 63 Ill. 2d at 185. However, a valuation expert may testify as to the reasonable probability of rezoning in explaining the basis for its valuation where his or her valuation is based on such a rezoning and the expert's testimony as to the reasonable probability of rezoning is warranted by the evidence. *Lombard Park District*, 103 Ill. App. 2d at 11. The evidence needed to show the expert's opinion as to the reasonable probability of rezoning has adequate support "must include sufficient evidence of certain 'factors' which would permit the jury to find this reasonable probability of rezoning." *Forest Preserve District of Cook County v. South Holland Trust and Savings Bank*, 38 Ill. App. 3d 873, 876 (1976). Such factors include the non-exhaustive list set forth in *Lombard Park District*:

> "[T]he rezoning of nearby property, growth patterns, change of use patterns and
> character of neighborhood, demand within the area for certain types of land use,
> sales of related or similar properties at prices reflecting anticipated rezoning,

physical characteristics of the subject and of nearby properties and, under proper circumstances, the age of the zoning ordinance. [Citations.]" *Lombard Park District*, 103 Ill. App. 2d at 8.

¶ 44 "The burden of proof of the reasonable probability of rezoning is on the landowner." *Department of Transportation v. Western National Bank of Cicero*, 63 Ill. 2d 179, 185 (1976). Where the trial court determines the evidence, as a matter of law, is insufficient to show a reasonable probability of rezoning it must exclude all such evidence and opinions of value based on the rezoning. *Lombard Park District v. Chicago Title and Trust Co.*, 103 Ill. App. 2d 1, 9 (1968). However, "[i]f there is sufficient evidence for a court to make a determination that the reasonable probability exists, then the witnesses may testify as to value based on such probability." *Western National Bank of Cicero*, 63 Ill. 2d at 185. It is then for the jury to decide the weight to be given the expert's conclusion as to value. *Lombard Park District*, 103 Ill. App. 2d at 9.

¶ 45 The trial court restated the evidence presented by defendants in support of their reasonable probability argument as follows:

> "That; one, the concept plan expressly provides for flexibility, two, that 159th Street has become more of a commercial corridor than 167th and that there has been other commercial development on 159th. And, third, the testimony of Village employees Friker, *** and Friling, ***, [that (a)] the Village could allow relocation of the commercial use without any official action to the ordinary planned approval process *** [and (b)] the Village had approved other variations in usage for those put forth on the concept plan."

¶ 46    In clarifying its ruling granting plaintiff's Motions *in limine*, the trial court stated there was an "insufficient showing of reasonable probability that Orland Park would approve relocation of the allotted commercial usage to the 159th Street area." In support of this contention, the trial court explained that a showing of a reasonable probability was required because Ordinance 2515 specified that all land uses must conform with the Annexation Agreement's Concept Plan (which provided for commercial use on the Kaufman Parcel, but only outside the Subject Property). Thus, the trial court reasoned government approval (a special use amendment) was required. On appeal, defendants first argue no showing of reasonable probability of reconfiguration of the Concept Plan is required because no rezoning would be necessary where the property is zoned LSPD which incorporates zoning for the commercial and residential highest and best uses contemplated by defendants' experts.

¶ 47    As explained in *Lake County Forest Preserve District v. Peterson*, 93 Ill. App. 3d 731, 733-34 (1981), a reasonable probability showing has been required in cases where governmental action is required to approve the land use beyond rezoning, including annexation, "obtaining approval of the sale or lease of railroad land by the Illinois Commerce Commission[,]" obtaining permission from city council to run a switch track to property suitable for warehouse use, and, in *Peterson*, obtaining an EPA permit for operation of a sanitary landfill. *Id*.

¶ 48    The evidence of the requirement for government action in this case is conflicting. The Annexation Agreement allows for such changes to the Concept Plan's uses configuration without the necessity of further hearings or rezoning. Defendants' own experts' testimony, including Friker, the Village's attorney who was involved in the negotiations and drafting of the Annexation Agreement, suggests that Village approval would be required for development deviating from the uses designated in the Annexation Agreement's Concept Plan.

¶ 49    Although it questioned its admissibility, the trial court noted Village employee testimony the "Village would simply allow relocation of commercial usage to 159th through ordinary planning processes." The trial court further referenced two parcels covered under the Annexation Agreement, in addition to the Kaufman Parcel, where development deviated from the use configuration identified in the Annexation Agreement's Concept Plan. As to the first parcel (the Calvert Parcel), the trial court referenced Friker's testimony a special use amendment was required where "the exact configuration of development was a little different from what was originally planned[.]" The court noted this contradicted a Village employee's testimony deviations from the Concept Plan would simply be allowed through the ordinary planning process.

¶ 50    As to the second parcel (the Ranquist Parcel), the trial court noted the zoning modifications deviating from the Concept Plan were "relatively minor modifications" in contrast to the Kaufman Parcel which the court, quoting defendants' appraiser Linberger, stated would have to be entirely flipped. The trial court pointed out "Defendant has not brought to the Court's attention *** a single instance *** [of the Kaufman Parcel] or any LSPD zoned property where the Village approved any relocation of any commercial usage at all, much less flipping an entire parcel around." The trial court acknowledged the development of commercial uses along 159th Street but stated "there was no showing any of that development required any action by the Village."

¶ 51    We agree with the trial court, based on the evidence, some governmental action would be required under Ordinance 2515 before there can be deviation from the Annexation Agreement's Concept Plan, specifically a special use amendment from the Village. Accordingly, we find defendants were required to make a reasonable probability showing.

¶ 52    The question then becomes whether the trial court abused its discretion in finding defendants failed to present sufficient evidence to establish a reasonable probability the Village would approve reconfiguration of the Concept Plan's uses – specifically moving the commercial use (which is allotted for in the Kaufman Parcel and covered under the current LSPD zoning) into the Subject Property. In answering this question in the negative, we find the trial court abused its discretion.

¶ 53    Defendants in this case tendered evidence zoning was flexible and similarly situated nearby properties were rezoned to commercial use. Testimony that zoning was changed on other parcels in the plan is admissible to demonstrate flexibility of the zoning ordinance to support evidence of a reasonable probability of rezoning as a basis for defendants' expert valuation opinions. See *Department of Public Works and Buildings v. Rogers*, 39 Ill. 2d 109, 114-15 (1968). The trial court's determination as to a sufficient showing of a reasonable probability of rezoning may also be based on representations made by counsel as to what the evidence would show. *Illinois State Toll Highway Authority v. Heritage Standard Bank and Trust Co.*, 250 Ill. App. 3d 665, 681 (1993). Our supreme court in *Rogers* concluded a recent rezoning ordinance for another property in close proximity to the subject property in that case was admissible to show zoning flexibility and was admissible, material, and relevant to support the owners' theory of a reasonable probability of rezoning. *Rogers*, 39 Ill. 2d at 114-15. Where "there is a dispute as to the flexibility of the present zoning ordinance, the [landowner] has a right to present evidence in support of a theory of reasonable probability of rezoning" which is "not restricted to the rezoning of nearby property, but may include many different factors." *Morton Grove Park District v. American National Bank & Trust Company of Chicago*, 39 Ill. App. 3d 426, 431 (1976). The existence of conflicting evidence of a reasonable probability of rezoning will not

preclude evidence of a probability of rezoning from being presented to a jury, but instead is properly resolved by the jury. *Illinois State Toll Highway Authority v. Heritage Standard Bank and Trust Co.*, 250 Ill. App. 3d 665, 681 (1993).

¶ 54    The Annexation Agreement expressly states "[f]lexibility in determining the final location of the five (5) land uses allowed within the [Kaufman parcel] is an essential ingredient of the Concept Plan."  The five land uses designated in the Kaufman Parcel include the commercial and residential uses contemplated by defendants' experts as being the highest and best use of the Subject Property.  Only defendants' location for the development deviated from the Concept Plan.  The Annexation Agreement specifically calls for flexibility on such deviations and calls this flexibility an "essential ingredient."  The Annexation Agreement further states "Its map symbols and indications are only conceptual illustrations and, therefore, are neither dispositive of the final locations of said parcel's allowed land uses, its use boundaries nor its environmental features.  All such matters are reserved for final determination upon Owner/Developer's plat submissions."

¶ 55    The Village's past exercise of this flexibility was highlighted by Friling during her deposition when discussing the Village's exercise of flexibility under the Annexation Agreement with respect to the development of two different Spring Creek parcels.  Specifically, the Village accommodated a deviation from the Calvert Parcel's concept plan from 8,000 square-foot single-family home uses to townhome uses.  The Village also accommodated a deviation from the Ranquist Parcel's concept plan with respect to the configuration of townhomes and apartments.  Friker discussed the Village's approval of these modifications as well as Village approval that had been given for the Long Run Creek Parcel to deviate from the Annexation Agreement's Concept Plan with respect to the number of condos and single-family units so long as the

developer remained within the maximum units permitted under the Agreement. Both defendants' appraisers Kleszynski and Linberger testified at their depositions they relied on the Annexation Agreement's flexibility language in making their determination as to a commercial highest and best use of the Subject Property and for their conclusion there was a reasonable probability the Village would approve reconfiguration of the property consistent with this highest and best use.

¶ 56    In their depositions, Friling, Kleszynski, Linberger, and McBride highlighted the location of the Subject Property which included 159th Street frontage. They also noted the property was currently vacant land presently used for agricultural purposes. All noted the age of Ordinance 2515 which was adopted in 1994 approximately 19 years prior to the filling. McBride discussed, among other factors, the topography of the Subject Parel, its physical characteristics, the traffic patterns based on surrounding commercial uses, the fact that 159th Street had become a commercial corridor since 1994, and the cost of commercial development in support of her conclusion commercial development on the Subject Property was feasible from an engineering perspective.

¶ 57    Friling also testified since 1994 there had been a lot of commercial development along 159th Street near the Subject Property and the area had become more of a commercial corridor than 167th Street where commercial use was located on the Concept Plan. She testified having additional commercial development would be in the Village's interest because the location is already a commercial node and further commercial development would be a continuation of the existing commercial use which is consistent with the "neighborhood commercial trend" in that area. She identified various commercial uses located in and near the Subject Parcel and along the intersection of 159th Street and Wolf Street including a Sportsplex health club, a bank, a

McDonalds, a Walgreen's, and a free-standing restaurant pad all built prior to 2006 as well as a Starbucks which was also built around that time.

¶ 58    Kleszynski and Linberger identified similar evidence to support their reasonable probability of reconfiguration theory.  Kleszynski testified about development patterns in the area including "predominantly commercial" transitions along 159th Street near the Subject Property.  He cited examples of these commercial development patterns including a car dealership, office condominiums, banks, shopping centers, free-standing retail stores, gasoline stations, and a municipal fitness center.

¶ 59    Kleszynski, citing "demand, the greatest net return to the land for the longest period of time, reasonable probability and the past actions of the municipality," testified it was his observation "there's reasonable probability that that area that is identified as the part taken would be commercial in character."  In support of this observation, he discussed,

> "the predominant development along 159th Street, which has been commercial in character, so the area development pattern.  And it's also based on the fact that in numerous instances, the municipality has entertained with a great deal of flexibility the needs of the community to *** provide things like a Walgreens drugstore or gas stations or office buildings or office condominiums or doctors' offices or bank buildings up and down 159th Street."

¶ 60    Kleszynski cited the rezoning of nearby property including the Winterset Office Condominiums in Orland Park and physicians' buildings located east of the Subject Property as farmland that transitioned to commercial use.  He noted a nearby Costco cite as transitioning from farmland to commercial use.  He believed the nearby BMW cite transitioned from farmland to commercial use.  He thought the Walgreens, Starbucks, and gas station east of the Subject

Property were at one time agricultural uses that were annexed and developed with commercial applications. While Kleszynski acknowledged none of these commercial developments occurred within the past five years, they did occur after the 1994 Concept Plan.

¶ 61 Linberger explained that essentially flipping the Concept Plan so the commercial property would run along 159th Street was the properties' highest and best use. Linberger based this conclusion primarily on,

> "existing development trends and land uses surrounding this property *** 159th Street has emerged as a commercial corridor. There is commercial development and communities/commercial development immediately adjacent to the east.
>
> So the growth pattern in terms of commercial here is certainly most clearly along 159th Street as opposed to 167th Street which forms the southern boundary of the site and at the point in time this plan was developed was possibly or obviously perceived to be the likely commercial corridor.
>
> So I am looking at existing land uses and the pattern of development and the pattern that's likely to continue. I don't see 167th Street emerging as an alternative corridor that would compete with 159th Street. The traffic counts are vastly higher on 159th Street than 167th Street.
>
> The area surrounding the southern end of this property right now along 167th is very low density residential; and so I think it would be the preference of adjoining property owners and common sense from a land planning basis to put the commercial that's associated with the development up to 159th Street.

> And the language of the plan would seem to welcome you coming in with a suggestion that reflects current market trends at the time you're developing it as opposed to what might be perceived in 1994."

¶ 62    In further addressing development patterns in the area of the Subject Property, Linberger's appraisal report indicates the authors of the Annexation Agreement and Concept Plan anticipated a commercial corridor along 167th Street, but "as the years have passed, the reverse has happened such that commercial developments are clustered along 159th Street while the development along 167th are largely residential.  The development along 159th in the vicinity of the [Subject Property] has been almost exclusively commercial since 1998 when construction began on the properties just east of the corner of Wolf and 159th.  I believe the trend was strengthened by completion of the interchange of I-355 and 159th Street in 2008."  Like Kleszynski, Linberger also identified commercial uses initially zoned residential on both the southwest and northeast quadrants where Wolf Road and 159th Street intersect that were approved by the Village since the 1990s including a municipal fitness center, a grocery store, a drug store, and some fast food restaurants.

¶ 63    Initially, we agree, opinion testimony purely on the question of whether the Village would change zoning on this property is inadmissible.  See *Lombard Park District*, 103 Ill. App. 2d at 11; *Western National Bank of Cicero*, 63 Ill. 2d at 185.  However, we find under *Rogers*, testimony regarding recent and nearby rezoning is evidence to support defendants' experts' testimony of a reasonable probability of rezoning.  *Rogers*, 39 Ill. 2d at 114-15.  The question of whether a reasonable probability exists in this case should be resolved by the trier of fact.  *Heritage Standard Bank and Trust Co.*, 250 Ill. App. 3d at 681.  The flexibility noted within the Annexation Agreement alone was sufficient evidence to support defendants' reasonable

probability of reconfiguration approval. See *Rogers*, 39 Ill. 2d at 114 (holding evidence of flexibility of a zoning ordinance supports a reasonable probability of rezoning theory). The trial court discounted these modifications as minor deviations compared to the concept plan for the Kaufman Parcel, which would have to be entirely flipped. However, substantial support for the flip was provided based on the *Lombard* factors including the rezoning of nearby property, growth patterns, change of use patterns, character of the neighborhood, physical characteristics of the subject and nearby properties, and the age of ordinance. See *Lombard Park District*, 103 Ill. App. 2d at 8. While we acknowledge these prior land use deviations from the Concept Plan approved by the Village may have been less significant than the one proposed here, we find this fact less significant given the justification for the deviation as presented by defendants' experts.

¶ 64 The cases addressing this issue allow for foundational evidence such as that provided by defendants and do not require actually obtaining the government approval for the rezoning or reconfiguration. See *id.* (finding sufficient evidence in support of a reasonable probability theory where experts relied on factors such as demand in the area, compatibility with the surrounding area, and the zoning trend in the area); see also *South Holland Trust and Savings Bank*, 38 Ill. App. 3d at 877 (finding the same based on expert's reliance on factors such as demand for that development type in the area, continuation of similar development already present in the area, characteristics of the land, and growth patterns). Moreover, we do not believe a showing of rezoning or reconfiguration of Spring Creek Parcels to allow for commercial uses where other uses were indicated is decisive in this case, particularly where there has been no opportunity for the Village to make such a determination. Specifically, Friling testified the LSPD zoning classification was created specifically for the Spring Creek Parcels, and Friker testified, since Spring Creek, no other land has been zoned LSPD. Furthermore, there was expert testimony

suggesting none of the Spring Creek Parcels developed thus far were suited to commercial development leaving no opportunity for such action by the Village.

¶ 65    Here, defendants presented considerable evidence supporting a reasonable probability of reconfiguration of the Concept Plan which expressly identified flexibility in allowing such modifications as an essential element of the plan.  We find no reasonable judge would find defendants failed to make a showing of a reasonable probability of reconfiguration.  Therefore, we find the trial court's rulings on the Motions in *limine* barring defendants from submitting evidence on the reasonable probability of a zoning change, the of flexibility in the zoning plan, and the evidence of zoning changes on nearby parcels was an abuse of discretion.

¶ 66    Plaintiff argues the "circuit court properly relied on *City of Quincy,* 237 Ill. App. 3d at 343, in excluding defendants' expert valuation in the unique circumstances of this case."  *City of Quincy* involved an eminent domain action to acquire land on which the company-landowner was operating an asphalt plant.  *Id*. at 339.  Prior to its eminent domain filing the city obtained an appraisal of the property utilized as an asphalt plant.  *Id*.  Based on the city's definite taking plans, the company began relocating its plant to ensure it would be operational for the following year's construction season.  *Id*.  Approximately five months later the city filed its eminent domain action and obtained a second appraisal with a substantially lower valuation ascribing a highest and best use of vacant industrial land based on the partial relocation of the asphalt plant.  *Id*. at 340-41.

¶ 67    The trial court granted the company's motion *in limine* barring the use of the city's second appraisal despite the city's contention it was appropriately obtained as of the date of the eminent domain filing.  *Id*. at 341-42.  The trial court's decision considered evidence including the city's expert appraiser (1) was not an expert in asphalt plants and had never appraised an

asphalt plant prior to that case, (2) did not discuss the extent of operations at the plant or consult with any other expert in the industry to determine whether the property was viable as an asphalt plant or what, if any, components were missing prior to the second valuation, and (3) improperly considered the taking in his valuation. *Id*. at 344. The trial court also noted the unique set of facts in the case – specifically the company began relocating its asphalt plant to ensure it could remain operational during its high season in reliance on the city's definite plans to acquire the property. *Id*.

¶ 68    Pointing to the unique facts of the case, the appellate court affirmed the trial court based on fundamental fairness as well as the "improbability of the evidence of highest and best use as [vacant industrial land as] stated in [the city's] second appraisal[.]" *Id*. at 344-45. The appellate court relied on our supreme court's decision in *Lehmann Estate, Inc.*, 388 Ill. at 426-27 and observed while highest and best use is generally a question for the jury, there can be unique situations where "a witness' testimony as to highest and best use may be so improbable it should be excluded from the jury." *City of Quincy*, 237 Ill. App. 3d at 343.

¶ 69    Unlike *City of Quincy*, this case does not involve a valuation based on an "improbable" highest and best use valuation. As explained above, defendants made a sufficient showing of reasonable probability the Village would approve reconfiguration of the Concept Plan for commercial uses on the Subject Property. Precluding the jury from considering this reasonable probability of a commercial highest and best use would result in a one-sided perspective and an unfair trial, which is what the court in *City of Quincy* sought to avoid. See *id*.

¶ 70    We also find misplaced plaintiff's reliance on *Department of Transportation v. Rasmussen*, 108 Ill. App. 3d 615 (1982), and similar cases to argue defendants were not damaged because the Subject Property was not commercially developed at the time of the taking or

approved for such development because we hold that defendants made a sufficient showing of a reasonable probability that commercial development would be approved by the Village to permit valuation evidence based on that use to be considered by the jury. *Western National Bank of Cicero*, 63 Ill. 2d at 185; *Lombard Park District*, 103 Ill. App. 2d at 9; see also *Lake County Forest Preserve District v. Reliance Standard Life Insurance Co.*, 29 Ill. App. 3d 145, 150 (1975) (stating "[i]t is a settled rule of law that probability of rezoning land sought to be condemned is a proper factor for consideration by the jury in establishing value."). For that reason, plaintiff's argument "[a]fter defendants' commercial valuations were ruled inadmissible, there was no genuine dispute of just compensation for a jury to decide" also fails. Moreover, actual government approval is not required before such evidence can be considered. See *Kelly*, 40 Ill. App. 3d at 902 (noting that a reasonable probability for rezoning is not *per se* too speculative even when the rezoning first requires an annexation that has not occurred).

¶ 71 Accordingly, we find the trial court abused its discretion in finding defendants failed to make a sufficient showing in support of its reasonable probability theory. Having provided a sufficient foundation, defendants should have been permitted to introduce evidence including witness testimony as to commercial uses within the Subject Property and valuations based thereon, with the weight to be accorded this evidence left to the jury. *Western National Bank of Cicero*, 63 Ill. 2d at 185; *Lombard Park District*, 103 Ill. App. 2d at 9.

¶ 72                                     (2) Windfall

¶ 73 Having concluded defendants made a sufficient showing in support of its reasonable probability theory, we turn to the second basis on which the trial court granted plaintiff's Motions – Windfall. The trial court held that to permit evidence regarding commercial usage of the property taken would give defendants a windfall. The court reasoned that after the taking

- 25 -

defendants would still have 10.6 acres of land available for commercial development; the trial court "had trouble picturing any buyer paying a commercial valuation for the property in this situation because "there is a cap on the number of acres that could be developed commercially;" and, given relocation of the commercial zoning area is speculative, the seller would not be selling their "right to develop those 10.6 acres" in a private transaction. The trial court concluded "[n]o one would pay a commercial rate for the property in that circumstance." Here too we find the trial court abused its discretion because the trial court did not apply the correct legal standard.

¶ 74    The goal of eminent domain is to provide the landowner just compensation for the land taken measured as the fair cash market value for the highest and best use to which the land is available irrespective of whether the land was being used for that purpose at the time of filing. *Lehmann Estate, Inc.*, 388 Ill. at 424. Just compensation precludes a windfall to the landowner or an award that would cause him or her to be financially improved. *Department of Transportation v. Kelley*, 352 Ill. App. 3d 278, 282 (2004). At the same time, as defendants point out,

> "the compensation to which the property owner is entitled is the amount of money
> necessary to put him in as good condition financially as he was with the
> ownership of the property. Nothing short of that amount conforms to the
> constitutional requirement of just compensation[.]" *City of Chicago v. Koff*, 341
> Ill. 520, 527-28 (1930).

Since *Koff*, it is well settled that just compensation valuations can be based on evidence of a reasonable probability of government approval for a different use of the land than that which is presently prescribed (once a preliminary showing of a sufficient foundation for that evidence has

been made; as we have found in this case).  *Supra*, ¶ 71.  See also *Lombard Park District*, 103 Ill. App. 2d at 9.

¶ 75    Defendant argues that whether a valuation would result in a windfall to the seller cannot be determined until the level of just compensation is determined by the trier of fact.

¶ 76    Based on our conclusion defendants made a showing of a sufficient foundation for evidence of a reasonable probability of rezoning, the jury also should have been permitted to consider just compensation evidence based on a commercial highest and best use on the Subject Property.  See *id*. at 9-10.  In *Lombard Park District*, the court held the trial court "correctly determined that it should have permitted the defendants' witnesses to testify before the jury and the jury to determine whether, under such testimony, there was a reasonable probability of rezoning, and if so, its effect on the fair market value of the premises in question.  *Id*. at 10.  In that case, the defendants' experts had testified "to the various factors upon which they relied to support their belief that there was a reasonable probability of the rezoning of the property [to a zoning] which in their opinion was the highest and best use for the property."  *Id*.  Those factors included but were not limited to "the surrounding area and comparability therewith; *** the trend of zoning in the area; and other factors."  *Id*.  The *Lombard Park District* court held the trial court correctly determined in posttrial proceedings it should have found there was "adequate evidence of a probability of rezoning to permit [the defendants' experts] to testify before the jury as to a valuation based upon a use permitted only by such rezoning."  *Id*. at 9.  Once the trier of fact determines the level of just compensation based on the competent evidence then it can properly be determined whether a valuation represents a windfall to the seller.

¶ 77    Further, defendants argue the determination of just compensation for purposes of plaintiff's windfall argument can be made on a commercial highest and best use (if the trier of

fact accepts defendants' experts' testimony which, we note, is not a given) because the commercial development rights that exist under the Spring Creek Annexation Agreement would transfer to the buyer of the property in a private transaction. Defendants citing *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 196 Ill. App. 3d 5, 19 (1990), argue \ "the court's analysis and windfall conclusion completely ignored the long-accepted valuation principle that just compensation must be determined based upon the price that would be set in a voluntary market transaction between private parties, not between the property owner and the government."

¶ 78   Plaintiff argues allowing valuation evidence based on commercial uses could result in windfall in this case in light of the Annexation Agreement's caps on commercial uses within the Kaufman parcel. Plaintiff notes the capped allotment of commercial development for the Kaufman Parcel is 10.6 acres, and defendants would retain 10.6 acres for commercial development after the taking. Thus, plaintiff assert that if the jury were to compensate defendants for 7.2 "commercial acres," with a sale of the remaining 10.6 commercial acres, defendants would effectively receive compensation for a total of 17.8 commercial acres as a result of the taking. Defendants cannot currently receive that level of compensation in a private transaction based on the existing caps, thus resulting in a windfall.

¶ 79   However, if defendants were compensated for the Subject Property based on a commercial valuation, and if defendants retained the remaining Kaufman Parcel for development, a windfall is not a forgone conclusion. Plaintiff's windfall argument not only presumes the village would not approve additional commercial uses on the remaining property but also that commercial development of defendants' remaining Kaufman Parcel would produce at least an equivalent value to commercial use within the Subject Property along 159th Street.

¶ 80    As to the former, plaintiff admits that "*[u]nless and until* defendants successfully amend the concept plant to relocate their commercial use to the taken property" defendants "would retain just 3.4 acres for commercial use" after a hypothetical private sale.  (Emphasis added.) However, we have already found sufficient evidence to permit testimony of a reasonable probability the property will be rezoned or reconfigured.  It is for the trier of fact to weigh the strength of the probability and its effect on defendants' valuation.  As to the latter, defendants' own expert rejected the latter conclusion.  Linberger's appraisal found that absent commercial development of the Subject Property the remaining property would diminish in value by more than $300,000.  Specifically, the appraisal states with development with commercial uses, after the taking a portion of the remaining property "would become viable only for a residential use." Linberger's appraisal then concludes "residential land has a substantially lower per square foot value than commercial acreage."

¶ 81    Moreover, plaintiff's windfall argument ignores the risk of undercompensating defendants for the Subject Property.  The trial court's rulings precluded evidence on development other than the residential uses contemplated in the Concept Plan.  However, as explained above, we believe defendants made a sufficient showing to admit defendants' experts' testimony a reasonable probability exists the Village would approve commercial development on the Subject Property as a basis for their valuation opinions.  As such, the weight accorded defendant's commercial highest and best use valuation (as well as plaintiff's residential theory) is properly left up to the jury.  *Western National Bank of Cicero*, 63 Ill. 2d at 185; *Lombard Park District*, 103 Ill. App. 2d at 9.

¶ 82                                                    Prejudicial Error

¶ 83    For these reasons set forth above, we find the trial court erred in granting plaintiff's Motions *in limine* (Motions 1,2,3,4, and 8).  As noted in the trial court's judgment, the effect of these erroneous rulings was to preclude defendants from presenting any evidence with respect to the commercial development of the Subject Property including "any valuation evidence at trial from expert witnesses retained by Defendants[.]"  Because these erroneous rulings might have changed the outcome of the trial, we find the errors to be prejudicial requiring the trial court's just compensation judgment to be set aside and the case remanded for a new trial.  See *Heritage Standard Bank & Trust Co.*, 250 Ill. App. 3d at 673 (holding the improper exclusion of evidence was sufficiently prejudicial to change the outcome of the trial); see also *Department of Transportation v. Bolis*, 313 Ill. App. 3d 982, 986 (2000) ("A condemnation award will be set aside on review and a new trial directed if the trial court made an erroneous ruling which might have misled the jury and which amounts to prejudicial error.").

¶ 84    In light of our reversal of the trial court's rulings on Plaintiff's Motions, we decline to address defendants' arguments concerning the trial court's denial of its motion for a supplemental valuation sought in response to the preclusion of all evidence relative to the commercial development of the Subject Property.  See *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009) ("As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided.").  Because we remand this matter for a new trial on the basis of prejudicial error based on the trial court's pretrial rulings, we also need not address defendants' claims of error in denying their motion for new trial.  See *id.*  However, we address defendants' arguments concerning the denial of defendants' Motions *in limine* as this will likely arise on retrial.

¶ 85                                Defendants' Motions *in Limine*

¶ 86    Defendants challenge the trial court's denial of defendants' Motions 2 and 3 seeking to bar the opinions of plaintiff's expert appraisers Solano and Tradrowski raising two issues.  With respect to defendants' Motion 2, defendants argue "Plaintiff's appraisers' consideration of the [2013] Comprehensive Plan as a basis for their valuation opinions for the whole property and the part taken before the taking is a clear violation of the valuation requirements of the Eminent Domain Act" and thus should have been barred.  With respect to defendants' Motion 3, defendants argue Solano's determination two acres of the Subject Property were impacted by a floodplain, diminishing his valuation of the property, improperly relied on "inaccurate, speculative, and incomplete maps *** not intended to accurately depict floodplain," and his appraisal should have been barred.

¶ 87                    Consideration of 2013 Comprehensive Plan

¶ 88    "An expert in valuation of property for condemnation purposes may only rely upon facts or data which are legally relevant to the issue of the fair cash market value of the property in question."  *City of Chicago v. Anthony*, 136 Ill. 2d 169, 187 (1990).  Illinois Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Ill. R. Evid. 401 (eff. Jan. 1, 2011).  Witness opinions based on "elements of damage which were not recognized by law as proper to be considered in condemnation proceedings" should be excluded unless the improper elements relied on can be separated out to ascertain a proper valuation.  *Illinois Power & Light Corporation v. Talbott*, 321 Ill. 538, 544 (1926); *Anthony*, 136 Ill. 2d at 187.  "Only such opinions based on evidence of lawful elements of damage can be of benefit to a jury in the assessment of the amount of damage."  *Talbott*, 321 Ill. at 544.  Section 10-5-60 of the Eminent Doman Act, 750 ILCS 30/10-

5-60 (West 2012), specifically excludes from the fair cash market value of the property at issue any appreciation or depreciation caused by the taking of the property for a public improvement. *Id*.

¶ 89    Defendant argues "Plaintiff's appraisers relied [in part on the 2013 Comprehensive Plan] as a basis for their highest and best use opinions, and this reliance directly resulted in a diminution in their opinions of the property's value." The trial court, in denying defendants' Motion 2, found plaintiff had "met its burden of showing that the relevant portion of the evidence was unaffected by the condemnation project." We agree.

¶ 90    There is no question the 2013 Comprehensive Plan was finalized and approved in August 2013, approximately six months after the February 19, 2013 valuation date. It is also undisputed that the public works projects intended by the taking at issue is referenced in the 2013 Comprehensive Plan. Further, in her deposition, Friling confirmed the 2013 Comprehensive Plan considered the widening of 159th Street (part of the purpose of the taking) when it determined the highest and best use of the property including the Subject Property. However, there is no evidence reliance on the 2013 Comprehensive Plan's assigned uses resulted in "any appreciation or depreciation caused by the taking of property for a public improvement" in plaintiff's experts' valuation.

¶ 91    Further, while the 2013 Comprehensive Plan considered the widening of 159th Street, Friger testified the land use designations for the Subject Property contained in the 2013 Comprehensive Plan were not impacted by street widening. Instead, she testified the uses were determined based on vacancies in the commercial centers along 159th Street which existed at the time and concern "additional neighborhood commercial retail to this area *** might end up harming what we already had and maybe even harm what would be added; it wouldn't be able to

stabilize." Friger further testified the 2013 Concept Plan's open space designation in the Subject Property was based on the Village's desire to put a regional park next to the Sportsplex recreational facility and discussions with defendants concerning this plan. The open space designation was not based on the placement of a detention basin as part of the taking project. Accordingly, the Subject Property's highest and best use was not impacted at all by the taking. Thus, consideration of and reliance on the 2013 Comprehensive Plan to assign the Subject Property's highest and best use could not *impermissibly* impact either Solano or Tadrowski's valuation.

¶ 92 We find the situation here to be similar to *Oak Brook Park District v. Oak Brook Development Co.*, 170 Ill. App. 3d 221, 236-37 (1988). In that case, the appellate court found no abuse of discretion by the trial court in admitting a county "Master Plan" covering the subject property and identifying its highest and best use which was adopted nine months after the valuation date in that case. *Id*. No abuse of discretion was found because "the testimony elicited concerning the plan indicated that the plan, although not binding ***, was being developed based on facts and circumstances which existed in 1984 [(the valuation date)]." *Id*. at 237. Here, the portions of the 2013 Comprehensive Plan relied on in Solano or Tadrowski's valuation opinions existed prior to the valuation date (and since the 1994 Annexation Agreement) and, more importantly, remained unchanged and unaffected by the taking project. Accordingly, we find no error with respect to the trial court's denial of defendants' Motion 2.

¶ 93 Accordingly, we also find no error with respect to the trial court's denial of defendants' Motion 1, which sought to exclude the 2013 Comprehensive Plan on which plaintiff's experts relied.

¶ 94 Solano's Consideration of Floodplain Maps

¶ 95     We also find no error with respect to the trial court's denial of defendants' Motion 3. Defendants argue Solano's opinion should be barred because it relied on his own scaled calculations using inappropriate sources as opposed to maps published by the Federal Emergency Management Agency (FEMA) which they contend "is the generally accepted map in appraisal practice for determining the location and amount of floodplain on a property."

¶ 96     "Where the issue is admission of an expert's entire opinion, the trial court should liberally allow experts to determine what materials are reasonably relied upon by those in his field.  [Citations.]  It is, then, the opponent's responsibility to challenge the sufficiency or reliability of the basis for the expert's opinion during cross-examination, and the determination of the weight to be given the expert's opinion is left to the finder of fact.  [Citations.]"  *People v. Lipscomb*, 215 Ill. App. 3d 413, 435 (1991); see also *Illinois Power & Light Corporation v. Talbott*, 321 Ill. 538, 543 (1926) (holding "The jury will not be bound by the opinions [of an expert witness], and the opposite party has always the right to test their value by showing the ground on which they are based, by cross-examination.").

¶ 97     In determining the size of the floodplain as part of his appraisal of the Subject Property, Solano testified he considered a combination of documents: (1) the Annexation Agreement which he scaled to size; (2) the 2013 Comprehensive Plan; and (3) the 2008 FEMA maps. Defendants acknowledge at least one of the sources Solano considered – the 2008 FEMA maps – was a proper source.  Moreover, as the trial court pointed out, Solano,

> "did rely, at least, in part, on the FEMA map.  He did also visit the property. Those are proper bases on which he could rest his testimony potentially.  And as far as the remainder of what he considered, he'll have to answer to the Jury for that."

We agree with the trial court. Because it is clear Solano's opinion with respect his floodplain calculation was based on at least some materials reasonably relied on by those in his field we find no error with respect to the trial court's denial of defendants' Motion 3. See *Lipscomb*, 215 Ill. App. 3d at 435.

¶ 98                                    CONCLUSION

¶ 99     For the foregoing reasons, the judgment of the circuit court of Cook County is reversed in part, affirmed in part, and remanded for a new trial consistent with this order.

¶ 100   Affirmed in part, reversed in part, and remanded.